2018 IL App (1st) 173096

No. 1-17-3096

Opinion filed on December 11, 2018.

Second Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* J.B. and J.N., Minors, | ) | Appeal from the |
| | ) | Circuit Court of |
| Minors-Respondents-Appellees, | ) | Cook County. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Nos. 14 JA 1035 |
| | ) | 14 JA 1036 |
| v. | ) | |
| | ) | |
| Kiera N., | ) | The Honorable |
| | ) | Andrea M. Buford, |
| Respondent-Appellant | ) | Judge Presiding. |
| | ) | |
| (J.B. and J.N., Appellees)). | ) | |

_____

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Mason and Justice Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1     Kiera N. appeals from the circuit court's order terminating her parental rights as to her

two children, J.N., born April 16, 2009, and J.B., born June 17, 2012. J.N. is now nine years old,

and J.B. is now six years old. Kiera N. argues service of process was improper and therefore the

court lacked personal jurisdiction over her, rendering the adjudicatory, dispositional, and termination orders void. We affirm.

¶ 2                                    BACKGROUND

¶ 3                    Petition to Adjudicate Minors Wards of the Court

¶ 4      Both minors were taken into protective custody on September 10, 2014, after an official from the Department of Children and Family Services (DCFS) observed Kiera "talking to herself and to household appliances." Two days later, on September 12, the State filed a petition to adjudicate J.N. and J.B. wards of the court. The petition alleged that the minors were neglected, subjected to an injurious environment, at substantial risk of physical injury, and that Kiera was unable to care for them due to her mental disability. In support, the petition stated that Kiera had admitted she was unable to care for the minors, that she had auditory hallucinations, and was in a physically abusive relationship with Shondell H., with whom she lived. According to J.N., who was then age five, Shondell would hit him, and J.N. went hungry, as there was no food in the home. DCFS investigator Priscilla Cash also filed an affidavit attesting that Kiera was "doing sexual favors in the presence of her daughter." Cash asserted neither child was safe in Kiera's care or custody.

¶ 5                    Temporary Custody Hearing and Service of Process

¶ 6      That same day, a temporary custody hearing was held with both the State and the minors via the public guardian present. Cash testified that during the course of her investigation, she went to Kiera's home at 5354 South Laflin Street in Chicago, spoke with Kiera, and informed her about the hearing, even doing so also on the morning of the hearing while explaining where to go. The court noted on the record that although Kiera had notice, she did not appear. The parties stipulated to the facts in the petition, and the State asked that temporary custody be taken

with prejudice given the notice to Kiera. The court found probable cause to believe the minors were abused, neglected, or dependent, and ordered their removal from the home based on immediate and urgent necessity. DCFS was appointed temporary custodian with the right to place the minors. DCFS then placed the minors with their maternal grandmother on the south side of Chicago, where they have since remained.

¶ 7    The transcript shows that at the next court date, on September 18, the State sought leave to serve the natural mother and the suspected natural fathers. The common law record reveals the court entered an order, dated September 26, for service of summons on Kiera and the two putative fathers, Shondell and Eric B. An exhibit further shows that on October 15, Kiera went to the emergency room at Jackson Park Hospital, reporting that she had depression and was hearing voices. According to the hospital, she had a "known history of schizoaffective disorder," and had "verbalized suicidal ideation." She had been hospitalized several times for psychological problems and had been "noncompliant with outpatient treatment." She was released on October 21, with the notes revealing her "discharge home" address to be 5354 South Laflin Street (although the hospital records also show a reported home address of 5140 South Hyde Park Boulevard, Chicago).

¶ 8    The transcript reveals that at the hearing on October 22, the State noted on the record that Shondell had appeared in court as a result of the substitute service on Nicole H., his sister, which was effected on October 3, at the Laflin Street address. The State additionally noted on the record that Kiera was subject to substitute service on Nicole H., which was also effected on October 3, at the Laflin Street address.[1] These on-the-record statements are consistent with two affidavits of service by the Cook County Sheriff's Office, which were supplemented in this

---

[1]The State also noted that substitute service on Kiera was effected on October 7. This oral statement stems from a misreading of the Sheriff's affidavit, as explained in further detail in the analysis.

record, showing that substitute service was effected on Kiera with respect to both her children on October 3. At the hearing, on the State's motion, the court ruled Kiera would be held in default of the guardianship petition for want of appearance or answer on substitute service. The State then sought leave for an alias summons on the other putative father, Eric, after noting service had been attempted five times. Eric later appeared in court when the case was recalled. Both Eric and Shondell presented brief testimony, and DNA tests were ordered. Relevant to this appeal, Shondell stated that he resided at the Laflin Street address and that Kiera was there "off and on" but that she was currently at Jackson Park Hospital for psychiatric treatment. As stated, however, hospital records showed her release the previous day. Shondell had seen her seven days prior, on October 15. In addition, Eric testified that he had contact with Kiera about a week before and she was currently living "from place to place." Last he heard, she was in Jackson Park Hospital. The paternity tests later revealed Eric to be J.B.'s natural father. Shondell was stricken from the case, as the DNA tests apparently ruled out his paternity.

¶ 9    DCFS conducted an integrated assessment of the case. The common law record shows that on March 17, 2015, Kiera arrived at the agency for her interview. She was reportedly both anxious to begin the process and engaged in the interview. Kiera, while unkempt, was oriented and answered the questions appropriately. She did "not accept any responsibility" for her children being in DCFS's care but did admit she had no stable housing and was unemployed. She reported smoking two to three blunts of marijuana a day and had been diagnosed with bipolar disorder and schizophrenia. Although she was taking medication, she hallucinated daily. The interviewer acknowledged that Kiera had come forward to be assessed for services but reported that Kiera was unstable and in need of a variety of services.

¶ 10              Adjudicatory Hearing Finding Neglect/Abuse

4

¶ 11     No report of proceedings exists for the adjudicatory hearing. The common law record, however, shows that on March 30, 2015, three days after Kiera's interview and pursuant to the State's earlier petition, the trial court entered an order adjudicating the children abused or neglected due to Kiera's lack of care, an injurious environment, and a substantial risk of physical injury, based on facts stipulated to by the parties. In particular, the assistant state's attorney, assistant public guardian, and assistant public defender (appearing on behalf of Eric), stipulated that if Cash were called to testify, she would state the following under oath.

¶ 12     Just before DCFS took custody of the children, Cash had "an in-person conversation" with Kiera. Cash observed that Kiera was dirty, poorly groomed and malodorous while sitting on the floor talking to herself. J.B. at one point smacked Kiera in the face, stating "B***, shut the f*** up," and in response Kiera continued talking to "an imaginary being" while also attempting to "engage the television and the microwave in conversation." Kiera admitted that she "gets direction and instruction from the television and she often talks to the microwave because it is her friend," since she hears voices telling her what to do. She had never obtained mental health services, although hospital records reveal a history of hospitalization for mental health problems.

¶ 13     Per the stipulation, in addition to the admissions regarding physical abuse at the hands of Shondell, Kiera admitted that she could not take care of her son and that she was not in a safe environment for her children. Kiera admitted that she "walks the streets prostituting herself with minor [J.B.] present at all times." In one instance, they went to the park, where Kiera left J.B. playing unsupervised. In addition, if called to testify, J.N. would state the same facts as alleged in the State's initial petition, and the parties stipulated that Kiera's medical records from Jackson Park Hospital would be admitted as an exhibit. As stated, the trial court found the children abused or neglected, and following this evidence, a dispositional hearing was set for May 12.

¶ 14                              Dispositional Hearing

¶ 15    No report of proceedings exists for the dispositional hearing, but the common law record

again shows that on May 12, 2015, the court entered a dispositional order finding that Kiera was

unable for some reason other than financial circumstances alone, and/or unwilling, to care for,

protect, train, or discipline her children. The record indicates that Kiera's March 17 integrated

assessment interview was entered as an exhibit. The court's written order stated that even though

reasonable efforts had been made to prevent removal of the children and services aimed at

preserving reunification had been made, it was in the children's best interests to remove them

from Kiera's custody. The court terminated the temporary custody, then placed the children in

DCFS guardianship and presented DCFS with the right to place the children. The same day, the

court entered a permanency order that the goal was still to return the children home "pending

status." The court noted that while Kiera had been assessed for services, she was not engaging in

them.

¶ 16                              Permanency Hearing

¶ 17    The transcript reveals that on January 6, 2016, the court held a permanency hearing.

Initially, the parties appearing included the assistant public guardian and the assistant state's

attorney. The assistant public guardian noted that Kiera was "on her way to the courthouse." The

case proceeded, however, because it was over thirty minutes past the scheduled time. The

caseworker, Kyla Farquhar, testified that the children's placement was safe and free of risk.

Farquhar noted that Kiera had been "minimally involved, if at all," up to the last court hearing in

June 2015. DCFS had recommended that she engage in individual therapy, parenting classes, an

assessment, domestic violence services, mental health services, and that she obtain both housing

and employment. Farquhar noted that Kiera engaged in services insofar as she had individual

therapy in October 2015 but had missed her last two sessions. She had also engaged in domestic violence victim services, beginning in November 2015. In addition, she completed a Juvenile Court Assessment Program (JCAP) in May 2015 and was referred to intensive outpatient services based on her marijuana use. Kiera had started visiting her children in October 2015 for only several hours. As her progress had been slow, inconsistent, and incomplete, and as the children were "thriving" in their foster home, Farquhar recommended substitute care pending termination of parental rights. Notably, a permanency planning report from January 2016 stated that after Kiera participated in the assessment in March 2015, she "did not make herself available again until" October 2015. Following this evidence, the court stated the goal of substitute care pending termination would be entered.

¶ 18    The same day, the case was recalled when Kiera formally appeared before the court. She was then assigned an assistant public defender.[2] The parties agree that this was the first date Kiera was represented by counsel. On defense counsel's motion, the court stayed the goal change until counsel could review the case. That assistant public defender assigned to Kiera subsequently withdrew due to a conflict, and a court-appointed attorney took his place.

¶ 19    On January 25, 2016, a permanency order in the common law record reflects that the goal was changed to substitute care pending a court determination on the termination of parental rights. On June 20, 2016, the State filed a supplemental petition to appoint a guardian with the right to consent to adoption because Kiera was unfit.

¶ 20                    Fitness and Best Interests Hearing

---

[2]When the case was recalled, the assistant public defender noted that Kiera had been "previously represented by the Public Defender" but that he did not have "any objection to being reappointed." The court then stated that it had heard the case before Kiera's arrival and her counsel was there on her behalf during this hearing, but that the court would "formally reappoint" counsel at that time.

¶ 21     On November 6, 2017, a fitness hearing was held followed by a best interests hearing. At the fitness hearing, the State asked that the trial court take judicial notice of both the order adjudicating the children neglected or abused and the dispositional order declaring the children wards of the court subject to DCFS guardianship. Included among the exhibits was the March 17, 2015, integrated assessment interview of Kiera. Kiera did not object. The combined testimony of her three caseworkers (who all served October 2015 through November 2017) revealed that Kiera had not made sufficient progress in completing the recommended services. She continued to smoke marijuana and failed to maintain her mental health. Caseworkers observed Kiera several times conversing with herself in front of J.N. and J.B. and while holding her newborn.[3] Although Kiera completed a domestic violence and parenting course, some drug programs, and regularly had supervised visits with her children, it appeared she had not been taking her psychiatric medications or obtaining medical care, which impaired her ability to parent. At one point, Kiera told a caseworker that she "couldn't do it," was thinking of signing her rights away, and began to cry. The court found by clear and convincing evidence that Kiera had failed to make reasonable efforts to correct the conditions responsible for the children's removal and to make reasonable progress towards returning them home. The court noted that Kiera had a long history of mental illness and failed to complete reunification services.

¶ 22     The bests interests portion of the hearing revealed that the children were safe, happy, and bonded in their current placement with Kiera's mother, Ora, and her long-time companion/friend, Dale S. Ora helped the kids with their homework, sometimes cooked, and went along on field trips, although she also stayed in her closed-door bedroom for lengths at a time, leaving the children to be cared for by Dale. Nonetheless, Ora testified that she loved them and wished to adopt them. Dale testified that he would serve as back-up in the event something

_____

[3]Kiera became pregnant in Spring 2016 and then gave birth to a child unrelated to this case.

happened to Ora. At the close of the best interests hearing, Kiera testified that when the case "first opened" she was not "trying to cooperate and do [her] services" but she would do so now. The court found it was in the best interests to terminate Kiera's parental rights since the children had been with their maternal grandmother for three years, were bonded, and Ora permitted contact with Kiera. The court thus appointed DCFS as guardian with the right to consent to adoption.

¶ 23    This appeal followed. After Kiera filed her opening brief on appeal challenging service of process, the public guardian moved to supplement the appellate record with two separate "affidavits of service" for both juveniles from the Cook County Sheriff's Office. A hearing was then held wherein Kiera contested the legitimacy of these affidavits before the trial court, arguing that they were not part of the circuit clerk's original file, did not bear the clerk's stamp, and did not appear in the docketing statement. Kiera also noted that she had contacted the state's attorney, public guardian, and public defender, and there was no evidence of return of service. The assistant public guardian responded that he had discovered the affidavits of service in the circuit clerk's file. [4] Although neither was filed-stamped by the clerk or accompanied by the actual summons or petition, he argued that the supporting evidence in the record established the legitimacy of the documents. The trial court overruled Kiera's objections and held the affidavits of service should be made part of the formal record on appeal.

¶ 24    The State and public guardian thereafter filed their response briefs. Kiera filed a reply brief but did not file an amended opening brief.

¶ 25                                    ANALYSIS

---

[4]Notably, the record contains three sheriff's affidavits of service on the putative fathers in this case, and all three bear the circuit clerk's stamp.

¶ 26 The Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2014)) identifies whether a child should be removed from his parents, made a ward of the court, and whether the parental rights must ultimately be terminated. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004); *In re C.E.*, 406 Ill. App. 3d 97, 107 (2010). After a child is placed in temporary custody, the circuit court must determine whether the child is abused, neglected, or dependent. *Arthur H.*, 212 Ill. 2d at 462. If the court finds abuse, neglect, or dependency by a preponderance of the evidence, the court must conduct an adjudication of wardship and then determine a proper disposition. *Id.* at 463-64; *In re C.L.*, 384 Ill. App. 3d 689, 693 (2008). An adjudication of wardship and disposition commonly occur following a "dispositional hearing." In particular, a dispositional hearing allows the circuit court to decide what further actions are in the best interests of a minor, and the hearing and ruling on whether to make a minor a ward of the court gives the parents "fair notice of what they must do to retain their rights to their child" in the face of any future termination proceedings. (Internal quotation marks omitted.) *In re April C.*, 326 Ill. App. 3d 225, 237 (2001).

¶ 27 If the parent fails to do what is needed to retain her rights, the Juvenile Court Act provides a two-stage process for terminating parental rights involuntarily. *C.E.*, 406 Ill. App. 3d at 107; 705 ILCS 405/2-29(2) (West 2014). First, there must be a showing, based on clear and convincing evidence, that the parent is "unfit," as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2014)). *C.E.*, 406 Ill. App. 3d at 107. Following an unfitness finding, the trial court's task is to determine whether it's in the minor's best interests to terminate parental rights. *In re D.T.*, 212 Ill. 2d 347, 352 (2004); *In re Jaron Z.*, 348 Ill. App. 3d 239, 261 (2004).

¶ 28 Kiera does not contest that the trial court had personal jurisdiction over her on January 6, 2016, when she appeared at the close of the permanency hearing. Nor does she contest that the

trial court had personal jurisdiction over her when, almost two years later, the court held a

hearing wherein it found her unfit to parent her children and consequently terminated her

parental rights. Kiera notes, however, that a party who submits to the court's jurisdiction does so

only prospectively and the appearance does not retroactively validate orders entered prior to that

date. See *In re Marriage of Verdung*, 126 Ill. 2d 542, 547 (1989); see also *BAC Home Loans

Servicing, LP v. Mitchell*, 2014 IL 116311, ¶ 43 (reaffirming *Verdung*); 705 ILCS 405/2-15(7)

(West 2014) (noting, with an appearance in court, a person submits to the jurisdiction of the

court).

¶ 29      As a result, Kiera contends that the record fails to establish proper service of process and

personal jurisdiction *preceding* her appearance on January 6, 2016. Specifically, she contends the

March 30, 2015, adjudicatory order (finding J.N. and J.B. abused or neglected) and the May 12,

2015, dispositional order (finding that Kiera was unable to care for her children and it was in

their best interests to be placed in DCFS custody) were both void for lack of personal

jurisdiction. As these were all jurisdictional steps towards the case's final progression, Kiera

argues this rendered the orders relating to termination of her parental rights void for lack of

personal jurisdiction. See generally, *Arthur H.*, 212 Ill. 2d at 464.

¶ 30      Kiera raises this argument for the first time on appeal. She did not raise this argument

before the trial court, despite formally appearing in court for almost two years before her parental

rights were terminated. The State and public guardian now challenge Kiera's claims. Initially, we

note that the public guardian contends we lack jurisdiction because Kiera's notice of appeal

identified only the order terminating her rights as to J.N. and J.B., without identifying the

adjudicatory and dispositional orders. See *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000) (appellate

jurisdiction unperfected where notice of appeal omitted mention of dispositional order and

neglect proceedings); see also Illinois Supreme Court Rule 303(b)(2) (eff. July 1, 2017) (a notice of appeal "shall specify the judgment or part thereof or other orders appealed from"). A similar scenario recently presented itself in *In re Jamari R.*, 2017 IL App (1st) 160850, in which the father challenged the adjudicatory and dispositional orders as void for lack of personal jurisdiction due to defective service, while specifying only the termination order in the notice of appeal. This court held we had jurisdiction over the underlying orders "to the extent they may be void." *Id.* ¶ 49. We see no reason to depart from the sound reasoning and conclusion in *Jamari R.* We thus proceed in our analysis, while noting that to the extent any report of proceedings have been omitted from the record, we construe that against Kiera. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) (an appellant has the burden to present a sufficiently complete record to support a claim of error, and any doubts arising from the incompleteness of the record will be resolved against the appellant).

¶ 31    Initially, both the State and the public guardian argue that the doctrine of *laches* bars relief in equity because Kiera took an inordinate amount of time to raise the purported lack of jurisdiction based on improper service, thus causing prejudice. See *Jamari R.*, 2017 IL App (1st) 160850, ¶ 60 (defining *laches*). Kiera, however, also contends her attorney's ineffectiveness in failing to flag the matter of service was reason for the delay. That is, Kiera argues that her attorney failed to review the record revealing the void adjudicatory and dispositional orders and to raise the matter, all of which caused her prejudice. Although *laches* may be considered first as a means of sidestepping the voidness analysis, Kiera's ineffective assistance of counsel claim makes it more expeditious to address whether service of process was effected and the trial court therefore had personal jurisdiction at the outset of the case. See *Eckberg v. Benso*, 182 Ill. App. 3d 126, 132 (1989) (noting no absolute rule governs when *laches* should apply); *cf. In re*

*Adoption of Miller*, 106 Ill. App. 3d 1025, 1030 (1982) (finding it was unnecessary to determine if the adoption judgment was void where *laches* applied). We review *de novo* whether the circuit court had personal jurisdiction over Kiera, and in doing so, we consider the whole record, including the pleadings and the return of service. *In re Dar. C.*, 2011 IL 111083, ¶ 60; *Central Mortgage Co. v. Kamarauli*, 2012 IL App (1st) 112353, ¶ 28.

¶ 32    Indeed, service of summons on a defendant is essential to create personal jurisdiction; as such, absent proper service, any judgment entered against a defendant is void *ab initio*, whether or not she had actual knowledge of the proceedings, and may be attacked at any time. *Dar. C.*, 2011 IL 111083, ¶¶ 60-61; *State Bank of Lake Zurich v. Thill*, 135 Ill. App. 3d 747, 754 (1985), *aff'd and remanded*, 113 Ill. 2d 294 (1986). Providing effective service is a means of protecting an individual's right to due process by allowing for proper notification of interested individuals and an opportunity to be heard. *Dar. C.*, 2011 IL 111083, ¶ 61. A parent is thus entitled to notice of a petition filed under the Juvenile Court Act. 705 ILCS 405/2-15 (West 2014). When a petition is filed by the State alleging abuse, neglect, or dependency so as to adjudge a minor the ward of the court, the clerk of the circuit court must issue a summons with a copy of the petition attached. *Id.* §§ 2-15, 2-13. A summons may be served on the minor's parent personally, by certified mail, or by publication. *Id.* §§ 2-15, 2-16. A court can also obtain jurisdiction by substitute service, which is merely service on a defendant that involves service on another person. *Prudential Property & Casualty Insurance Co. v. Dickerson*, 202 Ill. App. 3d 180, 184 (1990).

¶ 33    Where personal jurisdiction is obtained through substitute service of process, the "[s]ervice of a summons and petition shall be made by *** leaving a copy at [her] usual place of abode with some person of the family, of the age of 10 years or upwards, and informing that

person of the contents thereof, provided the officer or other person making service shall also send a copy of the summons in a sealed envelope with postage fully prepaid, addressed to the person summoned at his usual place of abode, at least 3 days before the time stated therein for appearance." 705 ILCS 405/2-15(5) (West 2014). In addition, "[t]he certificate of the officer or affidavit of the person that he has sent the copy pursuant to this Section is sufficient proof of service," which creates a presumption that the return is proper. *Id*. § 2-15(5); *Clemmons v. Travelers Insurance Co.*, 88 Ill. 2d 469, 481 (1981).

¶ 34    Moreover, while substitute service requires a showing of strict compliance with the statutory requirements, the officer's return is *prima facie* evidence of service and can only be set aside by clear and satisfactory evidence. *Nibco, Inc. v Johnson*, 98 Ill. 2d 166, 172 (1983); *Abbington Trace Condominium Ass'n v. McKeller*, 2016 IL App (2d) 150913, ¶ 12. That is, the affidavit of return is powerful evidence that can be overcome only by a contradictory affidavit or personal testimony. *Clemmons*, 88 Ill. 2d at 481.

¶ 35    Here, consistent with section 2-15(5) of the Juvenile Court Act, the Sheriff's affidavits show substitute service was obtained by leaving a copy of the summonses and complaints on October 3, 2014, at Kiera's usual place of abode with a family member or person residing there, 13 years or older, and informing the person of the contents of the summonses. In addition, in both cases, a copy of each summons was mailed to Kiera at her "usual place of abode" on October 3, 2014.[5] See *Alvarez v. Feiler*, 174 Ill. App. 3d 320, 324, 326 (1988) (noting the

---

[5]Kiera points out that the state's attorney noted on the record before the trial court that service was effected on October 3 and 7, then argues the time gap makes little sense and thus makes service suspect. The affidavit in case number 14 JA 01036 (for J.B.) was recorded on October 3, 2014. The affidavit in case number 14 JA01035 (for J.N.) was also recorded on October 3, 2014. The handwritten notations show that the same deputy sheriff (with star No. 11112) served the summonses as to both cases at "13:16" on October 3. The copy in J.N.'s case identifies October 3 in two separate places. However, there is a handwriting flaw at the bottom left, where the 3 appears to instead be a 7. Obviously, the state's attorney must have misread the number.

mailing requirement was satisfied). The affidavits specifically show the writ was served on Nicole H., Shondell's sister (noting she was female, black, age 32), on October 3 at 1:16 p.m. by the same sheriff deputy (star No. 11112). The affidavits identified Laflin Street as Kiera's address. The court then made an on-the-record finding at the October 22, 2014, hearing that Kiera was in default for failing to appear after being served. See 705 ILCS 405/2-21(1) (West 2014) (a court must enter a default order against a parent who had been properly served but fails to appear).

¶ 36    While Kiera now renews her objections to the validity of the sheriff's affidavit, she does so only in her reply brief without adequate supporting authority,[6] thus forfeiting any claim regarding the validity of the documents. See Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017) (arguments must be supported by legal authority and points not argued are forfeited and shall not be raised in the reply brief). We note that she also fails to make an argument that the affidavits bear any defects on their face, other than that they reflect the wrong address (as discussed further below). See *id.* We therefore conclude that the affidavits, viewed in light of the entire record, establish that Kiera was properly served.

¶ 37    Significantly, in this case Kiera has not presented any affidavit or personal testimony contradicting the sheriff's affidavit that service of process was effected on Kiera well before the substantive orders respecting the children were entered in the trial court. She did not challenge service in the trial court even though the court took judicial notice of the dispositional and adjudication orders at the fitness and best interests hearings. Kiera also did not file a motion

---

[6]Kiera relies on a case that has been vacated by the supreme court and also on another supreme court case from 1963 that does not support her contention that the absence of the sheriff's affidavits in the docking statement is significant. See *People v. Williams*, 27 Ill. 2d 327, 329 (1963) ("Although the common-law record imports verity and is presumed correct, where other facts appearing in the bill of exceptions are contradictory, this court will consider the matter upon the record as a whole."). And, while Kiera contends the circuit clerk's stamp is absolutely necessary, she does not provide any supporting legal authority.

under either section 2-1301(e) or section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1301(e), 2-1401 (West 2014)) challenging the termination judgment on the basis of a motion to quash service of process. See *id.* § 2-1301(e) (pursuant to a motion filed within 30 days of any final judgment, the court may set aside any final judgment on reasonable terms and conditions); *id.* § 2-1401 (a motion for relief from final judgments, after 30 days, but not 2 years after final judgment, may be filed in the trial court, or may be filed if a judgment is void). In short, rather than showing by clear and satisfactory evidence that the service could be set aside, Kiera has presented no evidence whatsoever. See *Kamarauli*, 2012 IL App (1st) 112353, ¶ 30.

¶ 38     Kiera, instead relies on the record to establish her conclusory claim that service was ineffective. She contends, for example, that the summonses were delivered to a home that was not her place of abode. Citing Shondell's and Eric's respective testimony that Kiera was at the Laflin Street address "off and on" and that she was "living from place to place." She also notes that the Laflin Street address was not listed as her "home" address in the Jackson Park Hospital records. However, a defendant's "usual place of abode" is a question of fact. *United Bank of Loves Park v. Dohm*, 115 Ill. App. 3d 286, 289 (1983). The underlying consideration is whether substituted service at the chosen dwelling place is reasonably likely to provide the defendant with actual notice of the proceedings. *Id.* Because Kiera did not file any affidavit stating the Laflin Street address was not her usual place of abode or that substitute service was unlikely to give her actual notice, the record is underdeveloped, leaving her contention a matter of pure speculation. See *Kamarauli*, 2012 IL App (1st) 112353, ¶ 30.

¶ 39     Moreover, we also find the record actually contradicts her claim. The original petition to adjudicate the children wards of the court alleged that Kiera was living with Shondell, and no one disputes that he lived at that address. The day of the temporary custody hearing, the

16

caseworker Cash spoke to Kiera at the Laflin Street address, notifying her of the hearing. Significantly, Shondell appeared in court on October 22 as a result of the very same substitute service, which was effected on his sister, Nicole. Even before then, Nicole reportedly told Shondell about the court proceedings. Given those facts and Shondell's testimony that he had seen Kiera on October 15, plus the hospital records that listed her discharge address as the Laflin Street address, the record indicates not only that the Laflin Street address was her "usual place of abode," but that Nicole presented Kiera with the summonses and complaints that were delivered. The Laflin Street address thus was reasonably likely to provide Kiera with actual notice of the proceedings. Rather than detracting from the sheriff's affidavits, these facts actually support appropriate service and notification.

¶ 40    Other facts support that Kiera was properly served. On March 17, 2015, before the court held its adjudicatory and dispositional hearings, Kiera submitted to a DCFS interview. The interview record shows that she knew her children were in DCFS's care at that time and Kiera was aware that she needed to comply with services for the children to be returned. This buttresses the sheriff's affidavit. We thus conclude Kiera was properly served prior to the adjudicatory and dispositional orders. Those orders, along with the ultimate termination order, are therefore not void.

¶ 41    We further observe that there are instances where a court may have jurisdiction over a party because of the person's participation in the case or recognition of benefits from the proceedings, even before a general appearance or service of process occurs. *Verdung*, 126 Ill. 2d at 547-48. Kiera's voluntary participation in the March 17, 2015, interview gave the trial court personal jurisdiction over her for that reason as well, notwithstanding any technical error in service. See *id.* at 549. Kiera's choice not to participate in the case after the March 17, 2015,

interview and to formally appear in court almost a year later on January 6, 2016, is not to be rewarded with a successful after-the-fact jurisdictional claim, particularly where the children have been in the system for over four years now. See *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 18 (a child's best interest takes precedence over any other consideration, including the natural parent's right to custody); *In re Angela D.*, 2012 IL App (1st) 112887, ¶ 40 (noting that the fundamental purpose of the Juvenile Court Act is to secure permanency for minors as early as possible). A parent's interest in her children is not a passing fancy or something that should occur to a parent almost as an afterthought. See *Miller*, 106 Ill. App. 3d at 1033.

¶ 42    In that sense, *laches* also precludes Kiera's claim, as *laches* may be invoked to bar the assertion of parental rights. See *Jamari R.*, 2017 IL App (1st) 160850, ¶ 53. *Laches* occurs when a party neglects or omits to assert a right, there is a lapse of time, and this all causes prejudice to the other party such that it operates to bar relief in equity. *Spielman v. County of Rock Island*, 103 Ill. App. 3d 514, 519 (1982). Kiera failed to assert her right to challenge the purportedly ineffective service, most critically to the prejudice of the children. The facts, as set forth above, demonstrate such a want of due diligence. *In re Miller*, 84 Ill. App. 3d 199, 202 (1980) (doctrine of *laches* may apply where parent has knowledge of circumstances that would lead a reasonable person to make an inquiry regarding guardianship and custody of child); *Rodriguez v. Koschny*, 57 Ill. App. 3d 355, 361 (1978) (even if service of process is defective, an attack on a decree may be barred by *laches*).

¶ 43    For these reasons, we also conclude that counsel was not ineffective for failing to raise the issue. A claim alleging ineffective assistance of counsel in a juvenile proceeding is governed by the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29; see also *In re Charles W.*, 2014 IL App (1st) 131281, ¶ 32. A

defendant must demonstrate that counsel's performance was deficient and that this deficiency prejudiced the defendant. *Veach*, 2017 IL 120649, ¶ 30. Respondent must satisfy both prongs of the *Strickland* test in order to prevail on a claim of ineffective assistance of counsel. *Charles W.*, 2014 IL App (1st) 131281, ¶ 33. If, however, the claim can be disposed of on prejudice alone, a court need not consider whether counsel's performance was deficient. *Id.* The prejudice prong requires a reasonable probability, not just a mere possibility, of a different outcome. *Id.* ¶ 32.

¶ 44    Aside from her challenge to service, Kiera argues that prejudice stemmed from other substantive errors occurring at or before the dispositional hearing. For example, she challenges improper stipulations, the court's reliance on inadmissible or insufficient evidence and the omission of necessary admonishments. Yet, dispositional orders are final and appealable as of right, and a timely appeal from such orders is the proper vehicle to challenge any claimed errors in those proceedings. See *In re Leona W.*, 228 Ill. 2d 439, 456 (2008); *In re Edward T.*, 343 Ill. App. 3d 778, 792 (2003). Kiera, however, did not appeal from the dispositional order at hand. Instead, she appears to be using her ineffective assistance of counsel argument as an end-run around her failure to appeal from that order. Furthermore, many of her contentions in this regard are not supported by legal authority, and she does not suggest these contentions would have rendered the judgment void.

¶ 45    In any event, because Kiera cannot demonstrate prejudice based on claims that are properly before us in this appeal, we reject her ineffective assistance of counsel claim. As stated, Kiera was adequately served and made fully aware that she risked losing her rights to her children by failing to comply with DCFS requirements. Appellate counsel is not arguing that Kiera's mental illness precluded her from understanding DCFS requirements or the court proceedings, and no such argument was raised in the trial court. Because service of process for

personal jurisdiction was effective, the orders were not void, and thus counsel would not have gained anything by raising a claim that would have failed. Kiera's contention regarding ineffective assistance of counsel fails.

¶ 46                                        CONCLUSION

¶ 47    Based on the foregoing, we affirm the judgment of the circuit court terminating Kiera's parental rights to J.N. and J.B..

¶ 48    Affirmed.