NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230223-U

NO. 4-23-0223

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 3, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* A.S., a Minor | ) | Appeal from the |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Circuit Court of |
|       Petitioner-Appellee, | ) | Ogle County |
|       v. | ) | No. 20JA9 |
| Matthew S., | ) | |
|       Respondent-Appellant). | ) | Honorable |
| | ) | John Benjamin Roe IV, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Cavanagh and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Respondent father's challenge to the trial court's personal jurisdiction over him at the time the court entered its adjudication and dispositional orders is barred by the doctrine of *laches*, and the court's judgment terminating respondent's parental rights is affirmed.

¶ 2    Respondent, Matthew S., appeals from the trial court's order terminating his parental rights to his child, A.S. He argues the court lacked personal jurisdiction over him at the time of the underlying neglect adjudication and dispositional proceeding, and, as a result, all subsequent orders—including the court's adjudication, dispositional, and termination orders—are void and should be vacated. We affirm.

¶ 3                        I. BACKGROUND

¶ 4    The record reflects Amanda N. is the biological mother of A.S., born in July 2014, and three other minors. In 2019 and 2020, the State initiated neglect proceedings involving A.S.

and her siblings. Relevant to this appeal, on June 15, 2020, the State filed a petition for adjudication of wardship in the present case, alleging A.S. was a neglected minor. At the time, A.S. was almost six years old and residing with Stephanie W., her maternal grandmother and guardian. The State's neglect allegations were based on claims that, against the instructions of the Illinois Department of Children and Family Services (DCFS), Stephanie W. allowed A.S. to have unsupervised contact with Amanda N. and Amanda N.'s paramour, David E. The State alleged David E. was an untreated sex offender and that both he and Amanda N. had previously been "indicated" by DCFS for, among other things, substantial risk of sexual abuse as to A.S.'s siblings. The State also alleged that the trial court previously found Amanda N. and David E. unfit, unable, and unwilling to care for A.S.'s siblings, and neither Amanda N. nor David E. were allowed unsupervised contact with those minors.

¶ 5        The State's petition identified A.S.'s "potential fathers" as David E. and an individual named Jeremy P. It identified respondent as A.S.'s "alleged father" with an address of "2722 Rudeen Cl. Apartment 3, Rockford, IL 61108."

¶ 6        The same date the State filed its petition, the trial court conducted a shelter care hearing. Although respondent did not appear at the hearing, the State represented that he lived in Rockford and was provided notice of the hearing by DCFS. According to the State, respondent chose not to appear on the basis that he did not believe he was A.S.'s biological father. During the hearing, the court determined probable cause existed for the filing of the State's petition. It placed A.S. in the temporary custody of DCFS.

¶ 7        Following the trial court's ruling, the State asked that David E. provide a deoxyribonucleic acid (DNA) sample to determine whether he was A.S.'s biological father and it asserted it "would send a summons to [respondent], because he was the person initially named by

the mother as the biological father of [A.S.]" The State also indicated it would attempt to obtain service on Jeremy P., the other "potential father" named in the petition. On June 15, 2020, the court entered a written order, requiring David E. to provide a DNA sample and ordering the State to "send a summons to" respondent and authorizing the State to serve Jeremy P. by publication. Following a hearing on July 14, 2020, the court entered another written order, granting the State "leave to publish on Jeremy [P.], [respondent,] and '[a]ll whom it may concern.' " Ultimately, the record fails to reflect respondent was ever served with a summons and a copy of the petition for adjudication of wardship, either personally, by publication, or otherwise.

¶ 8        On July 21, 2020, a DCFS family service plan was filed that included respondent as someone subject to the plan. His services included cooperating with DCFS, cooperating with DNA testing to determine paternity of A.S., and cooperating with an integrated assessment and any resulting recommendations. On September 15, 2020, a laboratory report was filed, showing David E. underwent DNA testing and results indicated he was not A.S.'s biological father.

¶ 9        On April 5, 2021, another service plan was filed in the case. With respect to respondent, the plan stated as follows: "[Respondent], alleged father of [A.S.], has expressed he would cooperate with a DNA test for [A.S.]; however, he failed to attend his appointment in October 2020. He has told DCFS he does not want to be involved in this case nor with [A.S.]" A service plan filed June 10, 2021, similarly stated respondent "failed to maintain contact with [DCFS]," failed to cooperate with DNA testing, and reported he did "not wish to be involved with DCFS or [A.S.]"

¶ 10        In April, May, and June 2021, the trial court conducted adjudicatory hearings in the matter. Respondent did not appear at the hearings. On June 15, 2021, the court entered an adjudication order, finding the State's petition was proven by a preponderance of the evidence and

that A.S. was a neglected minor in that her environment was injurious to her welfare.

¶ 11    On June 22, 2021, a DCFS dispositional report was filed. It identified respondent as A.S.'s "putative father" and stated as follows: "[Respondent] has failed to maintain contact with [DCFS]. He failed to cooperate with DNA testing for [A.S.] and has stated he does not wish to be involved with DCFS or A.S." On June 29, 2021, a court-appointed special advocate (CASA) report was also filed. With respect to respondent, the CASA report provided: "CASA has had no interaction with [respondent] and it is the understanding of this writer that he has not had contact with [A.S.] and does not wish to be involved with her."

¶ 12    In July, August, October, and November 2021, the trial court conducted dispositional hearings. On November 30, 2021, the court set forth its oral ruling, finding Amanda N. was unfit and unable to care for A.S. It also found David E., as the father of one of A.S.'s siblings who was also at issue in the proceedings, was unfit and unable to care for that minor. The court then granted the State's petition, made A.S. a ward of the court, and placed her in the custody and guardianship of DCFS. On December 8, 2021, the court's written dispositional order, which was consistent with its oral ruling, was filed. The record reflects respondent did not appear for the dispositional hearings, nor was he referenced in either the court's oral ruling or its written dispositional order.

¶ 13    On December 17, 2021, a DCFS status report was filed. With respect to respondent, it provided as follows:

> "[Respondent] had contact with [DCFS] in the summer of 2020. [DCFS] located him at that time when [A.S.] first entered foster care. He stated that he did not want to be involved in [A.S.'s] life but would be willing to cooperate with paternity testing. He failed to attend two different appointment dates in order to complete the

testing. He has not had contact with [DCFS] since that time."

¶ 14    The matter continued with references to respondent and his involvement in the case remaining unchanged until November 2022. On November 17, 2022, a DCFS permanency hearing report was filed, stating respondent had not been involved in A.S.'s life and that "a recent [Law Enforcement Agencies Data System] check" showed he had been arrested in June 2022 for failing to register as a sexual offender. The record shows the case was set for a permanency hearing on November 22, 2022. The appellate record contains no transcript of the hearing on that date; however, docket entries reflect respondent appeared before the trial court. The same date, the court entered a written order, stating as follows: "[Respondent] appears in person for the first time today. Court orders [respondent] to submit to paternity testing." The court then continued the permanency hearing to December 6, 2022, over DCFS's objection. While the record does not contain a transcript for the December 6 hearing, docket entries show respondent appeared at the hearing and provided a new address to the court.

¶ 15    Also on December 6, 2022, the State filed a petition for termination of parental rights and power to consent to adoption. It alleged both Amanda N. and respondent were unfit to parent A.S. and termination of their parental rights was in A.S.'s best interest. On January 24, 2023, the State filed an amended termination petition. Relevant to this appeal, the State alleged respondent was unfit for failing to (1) maintain a reasonable degree of interest, concern, or responsibility as to A.S.'s welfare; (2) protect A.S. from conditions in her environment that were injurious to her welfare; (3) make reasonable efforts to correct the conditions that were the basis for A.S.'s removal from her home during any nine-month time period after the June 15, 2021, neglect adjudication; and (4) make reasonable progress toward A.S.'s return to his care within any nine-month period after the June 15, 2021, neglect adjudication.

¶ 16 Docket entries further reflect that respondent appeared before the trial court with counsel at hearings on January 26 and February 28, 2023. Again, the record does not contain transcripts of those hearings.

¶ 17 On March 8, 2023, the trial court conducted fitness and best-interest hearings in the matter. Respondent appeared via Zoom and was represented by counsel. During the fitness portion of the termination proceedings, Rachel Williams testified she was the DCFS caseworker for A.S.'s family from November 2018 to May 2019. The matter was then transferred to DCFS caseworker Jessica Evans. In June 2022, the case was reassigned to Williams.

¶ 18 According to Williams, respondent first showed interest in becoming involved with A.S.'s case in December 2022. In January 2023, he was identified as A.S.'s biological father through paternity testing. However, prior to both dates, respondent had been given notice about the neglect proceedings. Williams testified that "early on in the case" respondent spoke with Evans, who was A.S.'s caseworker at the time, and two appointments "to complete DNA" testing were scheduled for him. She stated respondent was also made aware of court dates but indicated to Evans "that he didn't want to be involved with [A.S.] and didn't have the ability to care for her." DCFS recommended services for respondent that included completing an integrated assessment and completing a sexual offender assessment. Williams testified respondent did not participate in any services and, as far as she was aware, respondent had not ever had any visitation with A.S. or had any involvement in her life.

¶ 19 On cross-examination by respondent's counsel, Williams testified respondent was made aware of the juvenile case involving A.S. "when she came into care." She reiterated that respondent "was sent for DNA testing on two separate occasions and told the caseworker at the time that he was unable to care for [A.S.]" Williams acknowledged that her first conversation with

respondent was not until December 2022, "after he responded to the diligent search letter [she] sent." When asked about the last time prior to December 2022 that respondent was given notice of a court date, Williams responded: "I believe the investigator notified him of the shelter care hearing and I don't know beyond that specifically."

¶ 20 Williams further testified that in December 2022, respondent requested visits with A.S. However, he was not granted any because the goal in the case had changed to substitute care pending the termination of parental rights and because A.S. had never met him. Williams testified A.S. had been struggling with her mental health due to a lack of permanency and visits with respondent were "not clinically appropriate at that time." Nevertheless, Williams told respondent that he could provide her with letters and gifts for A.S. that she would give to A.S.'s therapist, who would then give them to A.S. when appropriate. On further questioning, Williams testified respondent never provided her with any letters or gifts for A.S. Additionally, she testified respondent had been convicted of a sexual offense and was on the sexual offender registry. When Williams spoke to respondent in December 2022, he indicated that he had not completed any treatment for his sexual offense.

¶ 21 During the fitness hearing, the State also presented testimony from Evans, the family's DCFS caseworker from May 2019 to June 2022. However, Evans was not asked any questions about respondent or his involvement in the case. The record also shows respondent presented no evidence on his own behalf.

¶ 22 The trial court found that both Amanda N. and respondent were unfit. In setting forth its decision with respect to respondent, the court stated it found Williams's testimony was credible and "also consistent with the court file, that [respondent] was aware of [A.S.'s] case almost through the entirety of the case."

¶ 23        At the best-interest stage of termination proceedings, the State presented a best-interest report prepared by CASA that concerned A.S. and testimony from A.S.'s therapist. The CASA report stated A.S. had suffered "extensive sexual abuse" and that she had been the victim of sexual abuse by at least one male companion of Amanda N. After being removed from her grandmother's care, A.S. was initially placed in a foster home with her siblings. However, she was moved to a difference placement after she and her sister "began displaying sexualized behaviors with each other." A.S. began residing in her current foster home in June 2020, when she was six years old. At that time, she exhibited "highly sexualized behavior and lack of appropriate social skills." A.S. did not have visits with Amanda N. "due to the severe trauma that visits caused her." According to the CASA report, discussing Amanda N. or seeing a picture of her caused A.S. to wet herself.

¶ 24        At the time of the best-interest hearing, A.S. had been living with her foster family for over two years. The CASA report stated she was bonded with her foster parents, referred to her foster parents as "mom and dad," and frequently asked when she could be adopted. It also stated that A.S. was starting to heal from the trauma she experienced in the care of her mother and grandmother and felt safe with her foster parents.

¶ 25        A.S.'s therapist, Heather Teteak-Berg, testified she began seeing A.S. in August 2020. At the beginning of treatment, A.S. was demanding, controlling, impulsive, and exhibited poor boundaries. Teteak-Berg also described A.S. as having a lot of nightmares and night terrors, wetting and soiling herself, being "super anxious," being "in a panic stage," and having "flashbacks." At the time of the best-interest hearing, A.S. was eight years old and had improved self-esteem and self-confidence, was happier and less anxious, not wetting or soiling herself, and no longer experiencing night terrors. Teteak-Berg noted, however, that A.S. would still sometimes

wet herself when talking about Amanda N.

¶ 26　　　　Teteak-Berg further testified that she observed A.S. interact with her foster family and discussed them with A.S. She stated A.S. loved her foster parents very much and wanted "to stay there." She opined that A.S. had developed a strong emotional attachment to her foster parents. The foster parents had also accepted A.S. into their family and expressed a willingness to adopt A.S if given the opportunity. Teteak-Berg opined it was in A.S.'s best interest to be adopted by her foster parents. She believed A.S. would react negatively to seeing Amanda N. Further, she stated that, to her knowledge, A.S. had never met respondent and was not aware of who he was. She did not believe it would be "positive" for A.S. to know about respondent, stating A.S. would "view that as a threat" and noting A.S. had expressed a strong preference for continuing to stay with her foster family.

¶ 27　　　　The trial court found that it was in A.S.'s best interest to terminate the parental rights of both Amanda N. and respondent. The same date the court made its oral ruling, it entered a written order, terminating the parental rights of both parties.

¶ 28　　　　This appeal followed.

¶ 29　　　　　　　　　　　　　　II. ANALYSIS

¶ 30　　　　On appeal, respondent argues the trial court lacked personal jurisdiction over him at critical stages of the underlying juvenile neglect proceedings. In particular, although he acknowledges that the court obtained personal jurisdiction over him when he physically appeared in court on November 22, 2022, prior to the termination proceedings, he contends no such jurisdiction existed before that time. Respondent maintains that, as a result, the court's adjudication, dispositional, and termination orders are void and must be vacated.

¶ 31　　　　In response, the State concedes that the record fails to reflect service of summons

- 9 -

and the original petition for adjudication of neglect upon respondent. Nevertheless, it contends respondent's challenge to the trial court's adjudication, dispositional, and termination orders is barred by the doctrine of *laches*. We agree with the State.

¶ 32    Our supreme court has recognized that "[i]f a court lacks either subject matter jurisdiction over the matter or personal jurisdiction over the parties, any order entered in the matter is void *ab initio* and, thus, may be attacked at any time." (Internal quotation marks omitted.) *In re Dar. C.*, 2011 IL 111083, ¶ 60, 957 N.E.2d 898. "When a trial court fails to obtain personal jurisdiction over a litigant, it is deprived of the authority or power to impose judgment against the litigant." *Id.* Whether a court obtained personal jurisdiction over a party is a legal question subject to *de novo* review. *Id.*

¶ 33    "[P]ersonal jurisdiction may be imposed on a litigant by effective service of summons." *Id.* ¶ 61. "Providing effective service is a means of protecting an individual's right to due process by allowing for proper notification of interested individuals and an opportunity to be heard." *Id.* "When a petition is filed by the State alleging abuse, neglect, or dependency so as to adjudge a minor the ward of the court, the clerk of the circuit court must issue a summons with a copy of the petition attached." *In re J.B.*, 2018 IL App (1st) 173096, ¶ 32, 122 N.E.3d 774. "A summons may be served on the minor's parent personally, by certified mail, or by publication." *Id.*

¶ 34    " 'The *laches* doctrine may be invoked to preclude the assertion of parental rights.' " *In re Jamari R.*, 2017 IL App (1st) 160850, ¶ 53, 82 N.E.3d 109 (quoting *In re Adoption of Miller*, 106 Ill. App. 3d 1025, 1030, 436 N.E.2d 611, 615 (1982)). "*Laches* occurs when a party neglects or omits to assert a right, there is a lapse of time, and this all causes prejudice to the other party such that it operates to bar relief in equity." *J.B.*, 2018 IL App (1st) 173096, ¶ 42. Application

of the doctrine "requires both delay and prejudice." *Jamari R.*, 2017 IL App (1st) 160850, ¶ 63.

¶ 35    In *Jamari R.*, the First District found that a respondent father's belated attack on the trial court's jurisdiction to enter adjudication and dispositional orders following the termination of his parental rights was barred by *laches*. *Id.* ¶ 65. There, the State filed a petition for adjudication of wardship of the minor child. *Id.* ¶ 3. At the outset of the proceedings, the identity and location of the minor's father was reported as being unknown and service by publication was permitted. *Id.* ¶¶ 4-8. The trial court thereafter entered adjudication and dispositional orders, finding the minor's unknown father in default and that the minor had been neglected, making the minor a ward of the court, and placing the minor in the guardianship of DCFS. *Id.* ¶¶ 9-10. Later, the matter advanced to the termination of parental rights, and the minor's mother identified the respondent as possibly being the minor's biological father. *Id.* ¶¶ 11-12. The State was given leave to serve the respondent and, ultimately, he was appointed counsel and determined by DNA testing to be the minor's father. *Id.* ¶¶ 12-14. The respondent also appeared for, and participated in, the termination proceedings, which resulted in the termination of his parental rights. *Id.* ¶¶ 17-35. He then appealed from the trial court's termination order, arguing for the first time on appeal that service upon him had been defective, rendering the trial court's adjudicatory and dispositional orders void and requiring the reversal of its termination order, which he argued was based upon the earlier void orders. *Id.* ¶ 36.

¶ 36    As stated, on review, the First District found the father's challenge to the adjudication and dispositional orders as void was barred by the doctrine of *laches*, which it described as follows:

> " '*Laches* has been defined as "such neglect or omission to assert a right, taken in conjunction with a lapse of time of more or less duration and other circumstances causing prejudice to an adverse party, as will operate to bar relief in equity."

[Citation.] The existence of laches "depends on whether, under all circumstances of a particular case, a plaintiff is chargeable with want of due diligence in failing to institute proceedings before he did." [Citation.]' " *Id.* ¶ 60 (quoting *Adoption of Miller*, 106 Ill. App. 3d at 1030).

In finding a lack of due diligence by the respondent in asserting a challenge to the trial court's personal jurisdiction over him, the court stated as follows:

> "The [respondent], represented by counsel, participated in the termination proceedings with knowledge that the adjudication and dispositional orders were prerequisites to termination proceedings. The [respondent] had actual knowledge of the adjudication and dispositional orders yet failed to take any steps to challenge them for almost two years. *** The [respondent] in this case has offered no explanation for his delay. Based on the [respondent's] knowledge of the orders and the absence of any legal disability or duress [citation], we find the [respondent's] delay in attacking the adjudication and dispositional orders was unreasonable. *Id.* ¶ 62.

¶ 37        In addressing the issue of prejudice, the First District stated that " '[i]n the case of an adoption the potential of prejudice is greater because the delay affects not only the immediate parties but also the child.' " *Id.* ¶ 63 (quoting *Adoption of Miller*, 106 Ill. App. 3d at 1033). It noted that the minor at issue had "been in a stable family relationship for more than two years" and that his life and family unit continued to be disrupted by the lack of finality in the case. *Id.* ¶¶ 63-64. The court pointed out that evidence in the case showed the minor was happy and comfortable in his foster home but wondered why he had not been adopted. *Id.* ¶ 64. It concluded that "[f]urther delaying resolution of [the minor's] permanent placement would be detrimental to [the minor's]

welfare." *Id.*

¶ 38      Here, as stated, respondent acknowledges that the trial court had personal jurisdiction over him when he appeared at a permanency hearing in the case on November 22, 2022. He argues only that the court lacked personal jurisdiction prior to that time. See *J.B.*, 2018 IL App (1st) 173096, ¶ 28 ("[A] party who submits to the court's jurisdiction does so only prospectively and the appearance does not retroactively validate orders entered prior to that date."). However, as in *Jamari R.*, respondent did not diligently pursue his jurisdictional challenge, resulting in prejudice to A.S.

¶ 39      The record shows the State initiated the underlying neglect proceedings on June 15, 2020. The same day, the shelter care hearing was conducted, and the trial court entered an order placing A.S. in the temporary custody of DCFS. Although respondent did not appear at the hearing, the State represented to the court that he had been given notice of the hearing by DCFS and chose not to appear because he did not believe that A.S. was his child. Thereafter, service plans and reports prepared by DCFS and CASA showed that respondent had been in contact with DCFS about the case. Despite initially agreeing to cooperate with paternity testing, respondent ultimately missed appointments for such testing and expressed that he wanted no involvement with A.S. Evidence presented during the termination proceedings also supports a finding that respondent had knowledge of the neglect proceedings shortly after the case was initiated. Specifically, the State presented evidence at the fitness hearing that respondent had been contact with a DCFS caseworker about A.S. "early on in the case" but expressed that he did not want to be involved with the minor and did not have the ability to care for her. Although he participated in the termination proceedings, respondent offered nothing to rebut such evidence.

¶ 40      As noted, respondent finally appeared before the trial court in the matter at a

permanency hearing on November 22, 2022. His appearance occurred after A.S.'s case had been pending for well over two years and had reached the point where the State was seeking to terminate parental rights. From November 2022 to March 2023, respondent continued to appear before the court and participated in the termination proceedings. At no point did he raise any challenge to the court's jurisdiction. He has also offered no explanation for his failure to challenge the adjudication and dispositional orders prior to this appeal.

¶ 41 Ultimately, the record shows respondent was well aware of the underlying neglect proceedings involving A.S. even before the entry of the adjudication and dispositional orders. Despite having such knowledge, he elected not to be involved in the proceedings or with A.S. for over two years, and he raised no personal jurisdiction challenge the entire time that the case was pending before the trial court. The facts clearly reflect a lack of due diligence and an unreasonable delay by respondent in pursuing the claim he now raises for the first time on appeal. See *In re Miller*, 84 Ill. App. 3d 199, 202, 405 N.E.2d 25, 28 (1980) (stating *laches* will bar a parent's challenge to an order regarding the guardianship and custody of a minor based upon defective notice if the parent had knowledge of circumstances that would lead a reasonable person to make an inquiry and the parent does not promptly do so); see also *J.B.*, 2018 IL App (1st) 173096, ¶¶ 41-42 (finding a mother's choice not to participate in a juvenile neglect case after a DCFS interview that occurred prior to adjudication and to formally appear before the court more than a year later was "not to be rewarded with a successful after-the-fact jurisdictional claim").

¶ 42 In this case, the record also supports a finding of prejudice to A.S. Evidence showed A.S. experienced trauma while in the care of her mother and grandmother and that she did not know respondent or have a relationship with him. Moreover, she had resided in the same foster home since June 2020, over two and a half years at the time of the termination proceedings. A.S.

had bonded with her foster parents and referred to them as "mom and dad." She reportedly felt safe in her foster home and was healing from the trauma she experienced before being taken into care. A.S.'s therapist opined that A.S. had developed a strong emotional attachment to her foster parents, and evidence showed A.S. expressed a clear desire to remain in her foster home and be adopted. The foster parents were also willing to provide A.S. with permanency through adoption.

¶ 43        Clearly, respondent's delay in challenging the trial court's personal jurisdiction over him threatens to disrupt A.S.'s current family life and her ability to achieve permanency. Like in *Jamari R.*, the record reflects further delay in the matter would be detrimental to the minor's welfare.

¶ 44        Accordingly, under the circumstances presented, respondent's jurisdictional challenge to the trial court's adjudication and dispositional orders is barred by *laches*. As respondent presents no challenge to the court's termination order other than one based upon his barred challenge to the court's prior orders, the judgment terminating his parental rights to A.S. is affirmed.

¶ 45                              III. CONCLUSION

¶ 46        For the reasons stated, we affirm the trial court's judgment.

¶ 47        Affirmed.