# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re A.M.*, 2013 IL App (3d) 120809

---

| | |
|---|---|
| Appellate Court Caption | *In re* A.M., A.M. and A.M., Minors (A.L., Petitioner-Appellee, v. D.M., Respondent-Appellant). |
| District & No. | Third District<br>Docket Nos. 3-12-0809, 3-12-0810 cons. |
| Filed | March 20, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In proceedings arising from the adoption of three children by their maternal grandmother after the termination of their biological mother's parental rights, the trial court's grant of the guardianship petition filed by the children's maternal aunt was reversed on the ground that the order was void *ab initio*, since the trial court entered the order without first considering the parental fitness of the maternal grandmother, there was no evidence supporting a finding that the grandmother was unable or unwilling to parent the children, and jurisdiction to hear a guardianship petition exists only after a determination that a parent is unfit. |
| Decision Under Review | Appeal from the Circuit Court of Tazewell County, Nos. 11-P-326, 11-P-376, 11-P-377, 11-OP-212; the Hon. Kevin Lyons, Judge, presiding. |
| Judgment | Reversed. |

Counsel on Appeal

Michelle N. Schneiderheinze, of Bloomington, for appellant.

Autumn LandiVittori, of Pekin, for appellee.

Panel

JUSTICE SCHMIDT delivered the judgment of the court, with opinion. Justices Carter and Lytton concurred in the judgment and opinion.

## OPINION

¶ 1     The petitioner, A.L., petitioned for guardianship of the three minor children, Ad. M., Al. M. and Ab. M., in the circuit court of Tazewell County. Respondent moved to dismiss the petition on the basis that she was willing and able to properly care for her children. The trial court denied the motion. Following a hearing, the trial court found that petitioner had rebutted the presumption that respondent, D.M., was a parent willing and able to make day-to-day child care decisions concerning the minors, and that it was in the minors' best interests that petitioner be awarded guardianship.

¶ 2     Respondent appeals, claiming, *inter alia*, that the trial court lacked jurisdiction to proceed on the merits of the guardianship petition under section 11-5(b) of the Probate Act of 1975 (the Probate Act) (755 ILCS 5/11-5(b) (West 2010)). We agree and reverse.

¶ 3                               BACKGROUND

¶ 4     Following the termination of the biological mother's parental rights, respondent, the biological maternal grandmother, adopted Ad. M. (Dree), Al. M. (Lexi), and Ab. M. (Abi). Petitioner is the adoptive sister and biological maternal aunt of the minor children.

¶ 5     Dree, the oldest child, began showing symptoms of mental illness at a very young age. Dree's first psychiatric hospitalization occurred in January of 2006 after she experienced hallucinations. Following that hospitalization, Dree was evaluated by Children's Home Association of Illinois (Children's Home) and began counseling services. She continues to have regular follow-up visits with a psychiatrist.

¶ 6     Respondent explained that when Dree's mental health deteriorates, she becomes depressed and refuses to go into her bedroom by herself. She will not sleep by herself, she refuses to bathe, and has outbursts of rage directed at all of the family members. Dree has attacked her younger sisters and torn up the house on more than one occasion. According to respondent, a number of these outbursts occurred after she told Dree that she could not do something; Dree would "never take no as an answer." When the outbursts were severe, emergency response services were called and often resulted in Dree being psychiatrically hospitalized.

¶ 7     In the spring of 2008, Dree was admitted to the Larkin Center, a residential treatment center for children. She returned home in August 2009 and did well with the help of

-2-

community support services from Children's Home. In February 2011, Dree was hospitalized after respondent found her in the bathtub with a hose around her neck. Dree was hospitalized again in March 2011, following an outburst in respondent's vehicle. All three girls were in the vehicle at the time. Dree and respondent began arguing. Dree became upset, grabbed the steering wheel and attacked everyone in the vehicle. Respondent was forced to pull the car over into a grocery store parking lot and called the police. At that point, Dree began banging her head on the dashboard of the car and screaming. By the time police arrived on the scene, Dree was calm enough to be transported by respondent to the local hospital. Children's Home evaluated her at the hospital. Dree was later admitted to Streamwood Behavioral Health Center, a children's psychiatric hospital.

¶ 8       While at Streamwood, respondent and Children's Home workers discussed placement for Dree at Cunningham Children's Home in Urbana, Illinois. Initially, Dree seemed fine with the idea of placement, but following a phone call with petitioner, she became agitated and upset. Dree began kicking the walls and "threw a fit." As a result, respondent restricted phone calls while Dree was still at Streamwood so as not to undo any of the progress the doctors and counselors were making with her. Thereafter, Dree was scheduled to go to Cunningham on March 30, 2011.

¶ 9       On March 28, 2011, just days prior to Dree's scheduled admission into Cunningham, petitioner filed a verified petition for order of protection seeking emergency relief. The petition alleged, among other things, that respondent's home was cluttered, there was evidence of feces in the bathroom, there was cat litter and food on the floor, and Abi's bed smelled of urine. The petition further alleged that the girls' hygiene needs were not appropriately tended to, and that respondent was unable to physically, mentally and financially care for the three girls. The emergency order of protection was granted *ex parte* on the same day, and petitioner received physical care of the minor children. Dree was discharged from Streamwood into petitioner's care and was not admitted to Cunningham Children's Home as previously scheduled.

¶ 10      Following an extension of the emergency order of protection, a guardian *ad litem* was appointed to the case, the parties agreed to participate in family counseling, and respondent was granted visitation with the girls. Petitioner then filed a petition for temporary and permanent guardianship of the minor children. The emergency order was subsequently extended at least five additional times.

¶ 11      At the outset of the trial, respondent's attorney filed a motion to dismiss petitioner's petition for guardianship, arguing that before the court could proceed with a determination on the guardianship petition, it had to determine whether respondent was willing and able to carry out decision-making responsibilities for the minor children. The court, without conducting an evidentiary hearing, denied the motion to dismiss and proceeded on the hearing to establish guardianship.

¶ 12      Respondent was called as an adverse witness by petitioner's attorney. Respondent testified that her monthly income was $2,113–$674 in social security disability benefits and a $1,439 monthly adoption subsidy. The subsidy is provided by the Illinois Department of Children and Family Services (DCFS) because the children's biological parents' rights were

terminated pursuant to a child welfare investigation.

¶ 13 Respondent suffers from diabetes and tubular aggregate myopathy, as well as blockages in her heart that required the insertion of four stents. She testified that these conditions are under control with medication, that her heart is strong and she is in good health. While her muscle condition limits her at times, it does not cripple her. On cross-examination by the guardian *ad litem*, respondent testified that she was in good health, but stated she was on disability for her various conditions. Respondent could not articulate a way in which her day-to-day activities were hindered by her muscle condition, other than the fact that it at times makes her restless and she needs her sleep to have a good day the following day.

¶ 14 The three girls resided with respondent in a rented three bedroom home prior to their placement with petitioner. There were allegations relating to the cleanliness of respondent's home. Respondent testified that her home was clean and free of rodents and bugs. While she did have some clothes that were stored in the home, she stated they were neatly folded and in piles. DCFS did investigate respondent based on the allegations alleged in petitioner's original order of protection, but found such allegations unfounded.

¶ 15 The guardian *ad litem* indicated that she visited respondent's home in May of 2011, stating that while it was cluttered, she "didn't see anything terribly wrong." The guardian *ad litem* qualified this statement, however, by indicating that she did not do a walk through of the entire house–she walked through the front door, sat at the kitchen table, and saw the living room and kitchen areas. She also testified that this initial visit was originally to be a surprise visit, but that respondent's attorney would not allow it. She also stated that the garage was "absolutely filled to the gills." This report from the guardian *ad litem* was made verbally on the record at the conclusion of the proceedings. The written guardian *ad litem* report, if one exists, was not included in the record on appeal.

¶ 16 Due to Dree's significant mental health issues, which include a diagnosis of bipolar disorder and oppositional defiance disorder, a number of different healthcare and social workers were assigned to this case. Amy Dennison, a social worker employed by Children's Home, worked with Dree for more than two years as a therapeutic stabilization worker. Amy was in respondent's home on a weekly basis and testified that she never had any concerns about the condition of the home.

¶ 17 Sharon Koonce, a mental health advocate for Lutheran Social Services, began working with Dree and her family to address her mental health issues when Dree was only nine years old. Sharon was also in respondent's home on a weekly basis. The court questioned Koonce directly regarding the allegations in the emergency order of protection, quoting the language verbatim: "That there was a cat urine problem. That the girls appeared to be foul smelling. That there were animals around the house, puppies, cat and a dog. That one of the young girls had, and tells us that she had, a severe bed wetting problem and her bed didn't have sheets and blankets on it. It was soiled and she slept on the sofa. And that [respondent's] room was a room that she didn't sleep in but she slept in a chair in the living room. That there were five-foot high piles of clothes in the living room, and clothes and clutter in the bedrooms." When the court asked Koonce if she had observed any of that during her visits, Koonce responded that she had not.

¶ 18        Elizabeth Acevedo-Alstrum is the adoption preservation clinical supervisor for Lutheran Social Services. Like Koonce, Elizabeth did not observe anything in respondent's home that caused concern or validated the allegations in the petition for the order of protection. Elizabeth conducted one unannounced visit in November of 2011. She stated that while respondent was surprised by the visit, she welcomed Elizabeth in and walked her through the home. Elizabeth checked the bathrooms and found that the toilet, sink and tub were all clean. The girls each had a bed. There were no smells that caused her concern. Overall, she thought the house was clean. This was Elizabeth's only visit. While she was the supervisor over the case, her contact with the family was limited. Other than reviewing the notes on the case made by other social workers, Elizabeth had never observed the behavior of the girls and respondent outside of the courtroom.

¶ 19        Petitioner's partner, A.W., testified that since the girls have been in their home, she and A.L. bought them iPods and cell phones. There are also gaming systems, like a Nintendo Wii or Xbox, that were originally purchased for their child, but that Dree, Abi, and Lexi have access to as well. The girls also have access to at least four of the five or six televisions in her home. A.W. stated that when she and petitioner discipline the girls, the first things to go are their cell phones. They then do not allow the girls to access the computers or their iPods, or will not allow them to spend the night somewhere for the weekend or have company over to the house. In regard to Dree, A.W. stated that there have been occasions where she has had to physically restrain Dree, and that such actions have become more frequent. A.W. further testified that she was against residential placement for Dree because she believes she can be treated without it.

¶ 20        Petitioner testified that she often provided financial assistance to respondent. Petitioner testified that her annual household income is approximately $100,000, whereas respondent makes roughly a quarter of that, all of which comes from social security and the adoption subsidy. Upon taking physical custody of the girls, petitioner and her partner purchased three new beds. The girls received all new clothes, school yearbooks and school portraits. Petitioner also purchased the girls new shoes because, according to petitioner, there was too much odor. Abi and Dree received iPods, and Lexi received a Nook tablet. When asked if respondent contributes financially, petitioner stated that approximately 5 times in the past 16 months, respondent gave her feminine products for the girls. Respondent did not contribute to groceries, clothes for the children, or school yearbooks or pictures. Respondent testified that even during the months the three girls were with petitioner after the order of protection was entered, she was still receiving the $1,439-per-month stipend. Without it, she testified, she would have lost her home.

¶ 21        Petitioner acknowledged that Dree is still a problem child. She admitted to having to restrain Dree on occasion to keep her from destroying the house and hurting herself or others. Since moving to petitioner's home, there have been occasions where the local authorities were involved. Dree snuck out of the house to go to a party and did not return home until the next morning. Petitioner acknowledged that since Dree moved in, she has snuck out of her home, engaged in underage drinking, substance abuse and sexual activity.

¶ 22        The guardian *ad litem* and petitioner implied through both testimony and questioning that respondent was using the psychiatric hospitalizations and residential treatment facilities as

a disciplinary measure. In response to a question about whether or not Dree could benefit from residential treatment, petitioner stated that "she has been there, done that" and that she felt "like it's time to do something different." Dree has since been admitted to residential treatment in Cunningham Children's Home following the filing of the notice of appeal.

¶ 23 Petitioner further testified to the girls' progress while in her custody. She stated that she and her partner, A.W., have implemented more rules and discipline to give the girls some structure and consistency. They have established routines to ensure the girls' personal hygiene is appropriate and that the girls understand the importance of such routines.

¶ 24 At the close of evidence, the trial judge issued a one-page written order finding that petitioner had, by a preponderance of the evidence, shown that respondent was unwilling and unable to make and carry out day-to-day child care decisions concerning the minors. The trial court also found that it was in the minors' best interests that petitioner be awarded guardianship. Neither of these holdings was accompanied by any specific factual findings by the trial court. This timely appeal followed.

¶ 25                                         ANALYSIS

¶ 26                                      I. Jurisdiction

¶ 27 As an initial matter, respondent alleges that the trial court lacked jurisdiction to proceed on the merits of the guardianship petition. We agree.

¶ 28 Section 11-5(b) of the Probate Act provides:

"The court lacks jurisdiction to proceed on a petition for the appointment of a guardian of a minor if it finds that (i) the minor has a living parent, adoptive parent or adjudicated parent, whose parental rights have not been terminated, whose whereabouts are known, and who is willing and able to make and carry out day-to-day child care decisions concerning the minor ***. There shall be a rebuttable presumption that a parent of a minor is willing and able to make and carry out day-to-day child care decisions concerning the minor, but the presumption may be rebutted by a preponderance of the evidence." 755 ILCS 5/11-5(b) (West 2010).

¶ 29 By its very language, section 11-5(b) makes clear that a guardianship petition can only proceed on its merits if the petitioner has overcome the presumption that the minor's parent is willing and able to care for the minor. Such was the finding in the seminal case on this matter, *In re R.L.S.*, 218 Ill. 2d 428, 441 (2006), where our supreme court held that a person who files a petition for guardianship under the Probate Act will have the petition dismissed if the child has a parent who is willing and able to carry out day-to-day child care decisions. That is, the issues of parental fitness and appointment of a guardian (best interests) cannot be tried together. Only after finding no fit parent does the court have jurisdiction to proceed on the merits of the guardianship petition.

¶ 30 "The question of whether a parent meets the willing-and-able standard set forth in paragraph (b) is a separate test from the best-interests-of-the-minor standard." *In re Guardianship of A.G.G.*, 406 Ill. App. 3d 389, 394 (2011). Under other statutory schemes, namely, the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2010)) and the

Adoption Act (750 ILCS 50/1 (West 2010)), "the fitness of a parent and the best interests of a child are seen as distinct matters, and courts have recognized the potential for prejudice and confusion when the issues are not addressed at separate hearings." *In re Guardianship of A.G.G.*, 406 Ill. App. 3d at 395.

¶ 31 In this case, respondent's counsel very clearly enunciated the correct standard to be applied by the court. The following colloquy occurred between the court and respondent's attorney when the court first addressed respondent's motion to dismiss the petition:

"MS. SCHNEIDERHEINZE [respondent's attorney]: Your Honor, whether or not we can proceed with this hearing today is going to–Well, I think you still have to have a hearing, but whether or not we can proceed with the determination on the guardianship is going to turn on whether the Court finds that [respondent] is willing and able to carry out her final decision making responsibilities. If the Court finds that she is willing and able to do that, then this Court would lack jurisdiction to go any further and put a guardianship in place.

\* \* \*

MS. SCHNEIDERHEINZE: I think what is being done here is we are trying to turn the standard of willing and able into a best interest of the child kind of standard. It's not about what is better for these children. It is not what is in their best interests, it's whether their living parent, who has been raising them since they were infants–

THE COURT: Is fit or unfit.

MS. SCHNEIDERHEINZE: Is able and willing to take care of them.

THE COURT: And are fit. \*\*\*

THE COURT: Is a presumption of fitness.

MS. SCHNEIDERHEINZE: Correct.

\* \* \*

THE COURT: Let's get back to the motion. So your position is that the, that the Court would have to first find what in order for us to proceed?

MS. SCHNEIDERHEINZE: The Court would have to find that [respondent] is unable and unwilling to make the day-to-day decisions to care for her children.

\* \* \*

THE COURT: We are having the hearing.

MS. SCHNEIDERHEINZE: But there will be evidentiary points that need to be established as to whether there is jurisdiction.

\* \* \*

THE COURT: Okay, thank you. The Court having considered the arguments of counsel and the pleadings filed will deny the Motion to Dismiss.

So the Court will proceed on its hearing to establish guardianship \*\*\*."

¶ 32 The record before us here clearly shows that without first holding an evidentiary hearing as to respondent's willingness and ability to care for the children, the trial court proceeded with the merits of the case, hearing the testimony of numerous witnesses over the span of

four nonconsecutive days. As further evidence that the trial court failed to hold the necessary bifurcated hearings, at the end of the proceedings it asked the parties to submit written closing statements, articulating for the court where the parties believed the best interests lay at that point. The trial court did not ask for the parties to articulate reasons why they believed the petitioner either had, or had not, rebutted the presumption that respondent was willing and able to make day-to-day child care decisions.

¶ 33    The court then issued a one-page written order: first, stating that it found the petitioner had rebutted the presumption that respondent was willing and able to make day-to-day child care decisions for the minor, and second, finding that it was in the minor children's best interest that the petitioner be awarded guardianship.

¶ 34    The trial court proceeded on the guardianship petition without first conducting a separate hearing on respondent's fitness as a parent. As such, the court lacked subject matter jurisdiction to proceed on the merits of the guardianship case. The award of guardianship in favor of the petitioner must be reversed. Likewise, the court's finding that the petitioner rebutted the presumption of respondent's fitness is also reversed. The proceedings below were flawed beyond repair. This finding of unfitness was declared after a hearing on the guardianship petition. We have carefully reviewed this record, and while the evidence establishes that the children may be happier living with petitioner, we see nothing to support a finding that respondent was unable or unwilling to parent the minors. Because the court was without jurisdiction to proceed, the order granting the guardianship is void *ab initio*. *In re M.W.*, 232 Ill. 2d 408, 414 (2009).

¶ 35    Our supreme court in *In re R.L.S.* explained the procedural protections of section 11-5(b):

> "By allowing a guardianship petition *to proceed to a hearing on the merits* over the wishes of a parent *only* when the parent has been established to be unwilling or unable to carry out day-to-day child-care decisions, the Probate Act respects the superior rights of parents while also insuring to protect the health, safety, and welfare of children." (Emphases added.) *In re R.L.S.*, 218 Ill. 2d at 441.

¶ 36    We are not unsympathetic to the difficult task the trial court faces when considering the fitness of a parent and the best interests of a child. However, human nature is such that if these issues are commingled, the question of whether a parent is willing and able may often be subsumed by what the court considers to be in the child's best interest. Such was the case here, where it is clear from the record as whole that the proceedings below were almost exclusively related to the best interests of the children. The law does not deprive parents of their parental rights simply because the children would be better off with some other guardians. Neither the legislature nor the supreme court has equivocated on the issue of when a trial court has jurisdiction to hear a guardianship case under the Probate Act: after, and only after, the court determines that the parent is unfit to care for the child(ren). *In re R.L.S.*, 218 Ill. 2d at 448; 755 ILCS 5/11-5(b) (West 2010).

¶ 37                                    II. Emergency Order of Protection

¶ 38    As a corollary, respondent also argues that the *ex parte* emergency order of protection, which was extended throughout the course of litigation, was never made a plenary order with

all of the attendant evidentiary findings, and therefore is no longer valid.

¶ 39 Pursuant to section 217(a) of the Illinois Domestic Violence Act of 1986 (750 ILCS 60/217(a) (West 2010)), a court may grant a petitioner an *ex parte* emergency order of protection regardless of prior service of process or notice upon the respondent. Emergency orders of protection are effective for not less than 14 days nor more than 21 days. 750 ILCS 60/220(a)(1) (West 2010). Any emergency order may be extended one or more times, as required, provided that the statutory requirements of section 217 are satisfied. 750 ILCS 60/220(e) (West 2010).

¶ 40 The trial court granted the initial *ex parte* emergency order of protection filed by the petitioner on March 28, 2011. The order was effective for the statutorily prescribed 21 days, or until April 18, 2011, when the matter was scheduled for hearing. The record reveals that the emergency order of protection was extended several times, the last being December 22, 2011.

¶ 41 At no point during the proceedings in the lower court was the emergency order of protection converted to either an interim or plenary order of protection. Thus, by operation of statute, the emergency order of protection self-combusted 21 days after December 22, 2011. 750 ILCS 60/220(a)(1) (West 2010). There is nothing for us to vacate in that regard.

¶ 42                                  CONCLUSION

¶ 43 For the foregoing reasons, the judgment of the circuit court of Tazewell County is reversed.

¶ 44 Reversed.