2025 IL App (1st) 241925

First Division
March 31, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| *In re* M.S., a Minor | ) ) ) | Appeal from the Circuit Court of Cook County. |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | No. 19 JA 00607 |
| v. | ) ) | |
| Benjamin B., | ) ) ) | Honorable Lisa M. Taylor, Judge, Presiding. |
| Respondent-Appellant). | ) | |

_____

JUSTICE COBBS delivered the judgment of the court, with opinion.
Justices Lavin and Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a hearing on August 28, 2024, the circuit court entered multiple orders, granting the Department of Child and Family Services' (DCFS) petition to appoint a private guardian for M.S., granting DCFS's motion to close the case, and denying respondent-appellant Benjamin B.'s petition for reunification services, an integrated assessment, and a change in the permanency goal. Benjamin appeals from those orders, arguing that (1) the circuit court improperly granted the petition to appoint a private guardian without first finding that Benjamin was unwilling and unable

to care for his minor daughter, M.S., as required by the Probate Act of 1975 (Probate Act) (755 ILCS 5/1-1 *et seq.* (West 2022)), and (2) the circuit court violated Benjamin's right to procedural due process. For the reasons that follow, we vacate the circuit court's August 28, 2024, orders and remand for further proceedings before a different judge.

¶ 2                                     I. BACKGROUND

¶ 3     M.S. is a female child, born on July 20, 2018. On June 6, 2019, the State filed a petition for adjudication of wardship and a motion for temporary custody, alleging that M.S.'s mother, Latresha M., who had two prior reports of neglect, was arrested for shoplifting with M.S.'s sibling. The petition listed Randal S.[1] "And All Whom It May Concern" as the putative father and stated that M.S. had not been taken into custody and her whereabouts were unknown at that time. The petition also alleged that M.S. was neglected and abused, her environment was injurious to her welfare, and there was a substantial risk of physical injury, pursuant to the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(a), (b), (2)(ii) (West 2018)). The DCFS affidavit accompanying the petition and motion provided that the agency received a report that M.S., 11 months old at the time, was living in a car with her mother and Randal.

¶ 4     On that same date, a temporary custody order was entered, finding probable cause that (1) M.S. was "abused/neglected/dependent," based on "the allegations as alleged in the [S]tate's petition[,]" (2) immediate and urgent necessity existed to remove M.S. from her home, and (3) "reasonable efforts" had been made but had not eliminated the need to remove M.S. from her home. The order also placed M.S. in the temporary custody of the DCFS Guardianship Administrator, "with the right to place the minor." According to DCFS's integrated assessment,

---

[1]The record contains an alternate spelling of "Randall."

on June 9, 2019, M.S. was located and was placed in the home of "a relative caregiver," *i.e.*, Randal's sister, Shelisa S.

¶ 5     On July 2, 2019, both Randal and Dennis A.[2] were listed as M.S.'s putative father on an order for service of summons. In 2020, as a result of DNA testing, both Randal and Dennis were excluded as M.S.'s father. Following proper notice by publication, on March 24, 2021, the court entered an order defaulting all unknown fathers.

¶ 6     On June 2, 2021, an adjudication order was entered finding M.S. to be abused or neglected by her natural mother under section 2-3(1)(a) ("lack of care"), (1)(b) ("injurious environment"), and (2)(ii) ("substantial risk/physical injury"). 705 ILCS 405/2-3(1)(a), (b), (2)(ii) (West 2020). The matter was set for disposition on August 4, 2021, and was later continued to November 8, 2021.

¶ 7     A June 10, 2021, DCFS family service plan reported that the caseworker and supervisor had learned that Randal was not M.S.'s father and that it was recommended that M.S. be removed from Shelisa's custody because she was not a relative, she had "failed in fingerprinting [M.S.]," despite reminders, and she had not completed the foster parent licensing process. It was recommended that M.S. be placed in the custody of her maternal aunt, as she is a licensed foster parent, was willing to foster M.S., and M.S.'s siblings already lived with her.

¶ 8     On November 8, 2021, a permanency order was entered with a goal of return home within 12 months. M.S.'s natural father remained unknown at this time. On May 4, 2022, another permanency order was entered with the same goal as the previous order. On November 16, 2022,

---

[2]According to a parenting capacity assessment in the record on appeal, Dennis is Latresha's husband.

with the identity of M.S.'s father still unknown, another permanency order was entered, but this time with the goal of private guardianship.

¶ 9      On May 24, 2023, Benjamin B. appeared in court, an attorney was appointed for him, and DNA testing was ordered.

¶ 10      On July 28, 2023, the court held a permanency hearing. During the hearing, the following exchange took place between the court and Benjamin:

"BENJAMIN: Okay. I'm confused about the whole situation when you say guardianship. Like I told her, I want to be in my daughter's life. But when you say guardianship, that means that they will have more rights than I have, because I don't have more access to her?

THE COURT: So you've just opened a can of worms for the Court. So here's what we're going to do, Mr. [B.]. We're going to come back on that September 18th date. We're going to see where the agency is.

And during that time, you and [your counsel] are going to have a conversation where she makes sure you understand what rights you're going to have and what rights a guardian would have. And then if we need to do something different, we'll do something different."

After the hearing, another permanency order was entered with the goal of private guardianship, stating that M.S. "has been in [Shelisa's home] since she was four months old. Foster mother willing to be her guardian."[3] On that same day, an order was also entered, finding Benjamin to be M.S.'s natural father.

---

[3]Although the records show that M.S. was placed with Shelisa on June 9, 2019 (at which time M.S. would have been almost a year old), Shelisa later testified that M.S. had lived with her since she was

¶ 11     At a September 18, 2023, status hearing, M.S.'s caseworker, Elisa Martinez, testified before the court that Benjamin was supportive of the guardianship. When the court asked if she had the opportunity to speak with Benjamin regarding executing a consent for the guardianship, Martinez responded: "Yes. We spoke to [Benjamin] last week. It seemed like he was kind of confused about the guardianship. My supervisor and I spoke to [Benjamin] and he agreed to continue with the guardianship."[4]

¶ 12     On January 10, 2024, for another status hearing, Martinez again testified that Benjamin was in agreement with guardianship. The court then asked Benjamin if he was willing to consent to the guardianship, and he asked, "What's the—what is the guardianship for?" The court then stopped any further discussion, ended the hearing, and instructed Benjamin to speak with his appointed counsel. Following the hearing, another permanency order was entered with the goal of private guardianship and stated, "It is in the minor's best interest because she is in a stable home and it will allow her to continue a relationship with her parents."

¶ 13     On February 1, 2024, Benjamin filed an emergency petition to change permanency as the goal. Therein, he alleged that no allegations had ever been made against him regarding his parentage, and he never had custody of M.S. or knew she was his child. He further alleged that, once his parentage became known, neither DCFS nor the caseworker ever offered him reunification services, and he did not understand legal guardianship until the previous court date.

---

three or four months old, a Child Link court report stated that M.S. was placed with Shelisa when she was six months old, and a DCFS service plan stated that M.S. was placed with Shelisa when she was three months old.

[4]It bears noting that additional testimony from Martinez made clear that finalizing guardianship was delayed at that point because there was an "open investigation" against Shelisa from the summer of 2023, regarding one of the children having been bitten by her dog while she was not at home, but they expected to close that investigation soon.

Benjamin—who alleged that he was employed, financially stable, with stable housing—asserted that he did not consent to guardianship and wanted to engage in reunification services.

¶ 14    On March 6, 2024, the circuit court referred the matter for mediation. On April 17, 2024, a mediation report was filed, which stated that Benjamin had multiple parent-child visits with M.S., supervised by Shalisa, and the caseworker agreed to inspect Benjamin's home, supervise a parent-child visit in Benjamin's home, and observe parent-child visitation "at least monthly."[5]

¶ 15    On April 18, 2024, Benjamin filed a "Petition for Order for Integrated Assessment for Father, for Referrals for Services to Father for Reunification, and to Change Permanency Goal of Guardianship to Return Home." The allegations therein were similar to those in his February 1, 2024, emergency petition described above.

¶ 16    An April 19, 2024, a Child Link court report stated that, in May 2023, Benjamin reported that he wanted to be in M.S.'s life but did not want custody of M.S. and he was invited to participate in the court proceedings at that time. According to the report, Benjamin had been offered services, but he refused to participate in any services, and he agreed with the goal of guardianship. The report later stated that Benjamin was attending parenting classes and "[t]he agency did not provide a referral since there was a goal already establish[ed] for guardianship." According to the report, on April 17, 2024, during mediation, Benjamin stated that he would like custody of M.S. The report stated that "[t]he agency is not in agreement with that" because Benjamin had not been a part of M.S.'s life and, according to Shelisa, Benjamin had been present with Latresha when she visited M.S., and he was "aware" that he could be M.S.'s father.

¶ 17    A hearing on Benjamin's April 18, 2024, petition began on April 22, 2024.

---

[5]Nothing in the record indicates that any of these activities ever occurred.

¶ 18    Benjamin testified that he was previously in a short-term romantic relationship with M.S.'s mother, Latresha, and, in approximately March 2018, he saw Latresha in a convenience store, observed that she was pregnant, and asked her if it was his child, to which she responded "no." He next saw Latresha in the fall of that year, when she asked him to take a look at her car. While there, she asked if he wanted to see the baby. He saw M.S. and again inquired if she was his baby. She again responded, "no." Around March 2019, Latresha contacted Benjamin and asked him to "come and get the baby," and he declined her request because she had previously told him that the baby was not his. Benjamin further testified that Latresha informed him that Randal was not M.S.'s father and that M.S. was instead his child. He responded that he would need a DNA test to confirm. At some point, he went to a DCFS office with his uncle, gave Latresha's name, and was provided with a social worker's contact information but the phone number was incorrect.

¶ 19    At this point, the court stopped the proceedings because the court had not anticipated the amount of time necessary for the testimony. The hearing was then continued to May 31, 2024.

¶ 20    On May 31, 2024, Benjamin's counsel filed a motion for a continuance, alleging that she required a transcript from the April 22, 2024, court appearance, but the court reporters had not yet prepared it, despite her timely requests. The continuance was granted, and the hearing was continued to September 16, 2024.

¶ 21    On August 7, 2024, DCFS filed a petition to appoint Shelisa as the guardian of M.S., pursuant to the Probate Act. The petition alleged that Benjamin was "unable to make and carry out day-to-day child care decisions" and "was served by notice pursuant to Section 11.10.1 of the Probate Act." The DCFS also filed a motion to vacate DCFS guardianship, terminate wardship, and close the case. A hearing on that petition and motion occurred on August 28, 2024.

¶ 22 Martinez, the caseworker, testified that she was assigned to M.S.'s case in May 2023. She testified that M.S., then six years of age, had been in Shelisa's care since she was "two, three months old" and that M.S. resides with Shelisa and her three children. She further reported she had no concerns with M.S.'s placement, there were no signs of abuse or neglect, and the home was safe and appropriate.

¶ 23 Regarding Benjamin, Martinez testified that he became known as M.S.'s biological father after the goal was changed to private guardianship and that Benjamin had not participated in any reunification services. In June 2023, she and her supervisor had a phone conversation with Benjamin regarding the guardianship petition. They explained the process to him, and he agreed to it. In August 2024, Martinez spoke with M.S., and M.S. expressed that she wanted to stay with Shelisa, who she calls "mom," but she liked spending time with her dad. She testified that M.S. has visitations with Benjamin, and Shelisa has never prevented M.S. from spending time with Benjamin. She further testified that Shelisa agreed to private guardianship and was prepared to accept those responsibilities for M.S. Finally, she testified that it would be in M.S.'s best interest for Shelisa to be named her private guardian.

¶ 24 On cross-examination, Martinez testified that reunification services were not offered to Benjamin, and an integrated assessment was never completed, both because the permanency goal was changed to private guardianship before Benjamin's involvement in the case. She also testified that she was not aware of Benjamin ever asking for reunification services. Regarding the June 2023 conversation with Benjamin, she testified that he was confused about his rights if Shelisa was appointed M.S.'s private guardian.

¶ 25 Shelisa testified that she wished to become M.S.'s private guardian, she understood the obligations of a guardian, and she planned to "continue to allow [Benjamin] to visit with his

daughter at least once per month either supervised or unsupervised." She further testified that she first met Benjamin when M.S. was around five or six months old, and in 2022, he placed in her mailbox a letter, which stated he was M.S.'s father and also contained the results of a DNA test. Soon after, she had a conversation with Benjamin, in which he stated that he believed he was M.S.'s father but Latresha had denied that he was repeatedly. She further testified that, prior to 2022, Benjamin drove Latresha to Shelisa's home on three occasions; according to Shelisa, there was no discussion on those occasions that he was M.S.'s father; and he did not interact with M.S. Finally, Shelisa testified that she was aware that Benjamin wanted custody of M.S., but she was not in favor of that because M.S. has lived with her since she was three months old and "he knew it was a possibility that [he] could have been the father."

¶ 26    Benjamin testified that he learned in December 2022 that he was M.S.'s father and he "call[ed] around" to DCFS offices but he had difficulty because he mistakenly believed M.S. shared her mother's last name. He also testified that, at some point in 2021, Latresha informed him that he was M.S.'s father but he did not get a DNA test at that time because of difficulties with Latresha. He testified that he completed 10 weeks of parenting classes once he learned that he was M.S.'s father. When he first learned of the DCFS case in 2022, he understood guardianship to mean that both himself and Shelisa would have custody of M.S.

¶ 27    Regarding his relationship with M.S., he testified that, since April 2023, he visited M.S. weekly and spoke with her via her iPad, which he purchased, almost every day. At some point, he adopted a cat and a dog for M.S. He also testified that, whenever she visited him, she would state that she wanted to stay with him but sometimes she would say that she wanted to stay with Shelisa. He testified that he has an excellent relationship with Shelisa, but he is not in agreement with Shelisa being named as M.S.'s private guardian. Finally, he testified that, if he was granted custody

of M.S., his aunt, who lives near him, would be able to watch M.S. while he was at work, and he would want M.S. to visit with Shelisa often as well.

¶ 28    At the conclusion of the hearing on DCFS's petition, the circuit court denied Benjamin's petition and then granted DCFS's petition. In particular, the court stated the following:

> "So first and foremost, this Court is denying [Benjamin's] request to change the permanency goal so I do need an order to that effect, and I am striking the September 16th date.

> It is this Court's position that I am always bound by the Juvenile Court Act, and the purpose of the Act is to secure for each minor subject hereto such care and guidance, preferably in the minor's own home as will serve the safety and moral, emotional, mental and physical welfare of the minor and dot dot dot the rest of the Act.

> I cite that specific provision for two purposes. First, I understand [Benjamin] was nervous, but I understood his testimony to clearly state that as early as 2021, he had suspicion about being the father.

> As soon as he appeared in Court[,] he was provided counsel. Had he appeared back in 2021, he would have been provided counsel.

> My directives as I understand it is to act in this child's best interest. For the entirety of her life—less three months—she has been with [Shelisa]. The motion for private guardianship is granted, letters to issue instanter, and this matter is closed. I thank you all."

Relevant here, Benjamin's counsel raised the issue of the hearing on Benjamin's petition, which had been paused. She further noted that the matter before the court on this particular day was on DCFS's motion, not Benjamin's.

¶ 29    On the day of the hearing, the court entered a written order, denying Benjamin's petition and striking the continued hearing date of September 16, 2024, along with orders granting DCFS's motion for private guardianship and motion to close the case. The court also entered letters of office for Shelisa on that day.

¶ 30    This appeal followed.

¶ 31                                    II. ANALYSIS

¶ 32    On appeal, Benjamin asserts two issues: (1) the circuit court lacked jurisdiction to name a third-party guardian for M.S., absent a finding that Benjamin was unwilling and unable to care for her, and (2) the circuit court violated Benjamin's procedural due process rights in denying Benjamin's petition before his hearing was completed.

¶ 33    We first address Benjamin's argument that, pursuant to the Probate Act, the circuit court lacked jurisdiction to grant the guardianship petition without first finding that he was unwilling and unable to care for his daughter. According to Benjamin, once his paternity was known, Benjamin was entitled, under section 11-5(b) of the Probate Act (755 ILCS 5/11-5(b) (West 2022)), to a rebuttable presumption that he was willing and able to care for M.S. He also argues that the court's inclusion of "unknown fathers" in its November 8, 2021, disposition order was not binding on Benjamin because his paternity had not yet been established. As such, he requests that this court reverse the August 28, 2024, orders and remand for further proceedings.

¶ 34    In response, the public guardian, on behalf of M.S., and the State contend that Benjamin incorrectly asserts that the Probate Act is applicable to the guardianship proceedings, rather than the Juvenile Court Act.[6] In his reply brief, Benjamin points out that DCFS's petition to name

_____

[6]The State adopted the arguments set forth in the public guardian's brief, and thus, our subsequent references to the public guardian's arguments implicitly include the State's arguments.

Shelisa as private guardian of M.S. was explicitly filed pursuant to the Probate Act and the court's order granting the petition explicitly cited the Probate Act. Our review of the record confirms that both the petition and the order for guardianship were entered pursuant to the Probate Act. Thus, DCFS's decision to proceed under the Probate Act for guardianship controls our analysis, and the public guardian's citations to guardianship cases applying the Juvenile Court Act are inapposite here. See *In re Estate of H.B.*, 2012 IL App (3d) 120475, ¶ 33 (the nonparent's "decision to proceed under the Probate Act controls our analytical approach on appeal").

¶ 35    Section 11-5 of the Probate Act (755 ILCS 5/11-5 (West 2022)) governs the appointment of a private guardian of a minor. To grant a petition for guardianship under section 11-5, a court must make two evidentiary findings.

¶ 36    Where the petition is filed by a nonparent, as a threshold requirement, the petitioner must first establish standing. *Id.* § 11-5(b). The purpose of section 11-5(b) is "to prevent the trial court from exercising jurisdiction when a petitioner lacks standing." *In re Guardianship of S.C.*, 2024 IL App (5th) 240659, ¶ 52 (citing *In re R.L.S.*, 218 Ill. 2d 428, 436 (2006)). In particular, paragraph (b) provides as follows:

> "The court lacks jurisdiction to proceed on a petition for the appointment of a guardian of a minor if it finds that (i) the minor has a living parent, adoptive parent or adjudicated parent, whose parental rights have not been terminated, whose whereabouts are known, and who is willing and able to make and carry out day-to-day child care decisions concerning the minor, unless (1) the parent or parents voluntarily relinquished physical custody of the minor; (2) after receiving notice of the hearing under Section 11-10.1, the parent or parents fail to object to the appointment at the hearing on the petition; (3) the parent's or parents' consent to the appointment as evidenced by a written document

that has been notarized and dated, or by a personal appearance and consent in open court; or (4) the parent or parents, due to an administrative separation, are unable to give consent to the appointment in person or by a notarized, written document as evidenced by a sworn affidavit submitted by the petitioner describing the parent's or parents' inability to receive notice or give consent; or (ii) there is a guardian for the minor appointed by a court of competent jurisdiction. There shall be a rebuttable presumption that a parent of a minor is willing and able to make and carry out day-to-day child care decisions concerning the minor, but the presumption may be rebutted by a preponderance of the evidence." 755 ILCS 5/11-5(b) (West 2022).

¶ 37    "This standing requirement protects the parents' superior rights and ensures that guardianship proceedings pass constitutional muster." *S.C.*, 2024 IL App (5th) 240659, ¶ 53. Additionally, regarding this section of the Probate Act, our supreme court has stated:

"By allowing a guardianship petition to proceed to a hearing on the merits over the wishes of a parent only when the parent has been established to be unwilling or unable to carry out day-to-day child-care decisions, the Probate Act respects the superior rights of parents while also insuring to protect the health, safety, and welfare of children." *R.L.S.*, 218 Ill. 2d at 441.

¶ 38    If the trial court finds that the nonparent has standing, then, and only then, can the trial court proceed to a determination of the best interests of the minor. 755 ILCS 5/11-5(a) (West 2022) ("[T]he court may appoint a guardian *** of a minor *** as the court finds to be in the best interest of the minor or minors."). The findings of the best interests of the minor and a parent who is "willing and able" are "separate questions of fact." *In re Guardianship of A.G.G.*, 406 Ill. App. 3d 389, 393 (2011). The issue of standing for a nonparent often necessitates a separate evidentiary

hearing from the issue of best interests of the child. See *In re A.W.*, 2013 IL App (5th) 130104, ¶ 15 (citing cases where separate evidentiary hearings were held on the issue of standing).

¶ 39    In the case before us, DCFS filed a petition for guardianship, pursuant to the Probate Act, alleging, *inter alia*, that Benjamin is the "biological father" and "is unable to make and carry out the day-to-day child care decisions concerning the minor." Just to reiterate, not only did DCFS file the petition under the Probate Act, but the agency also referenced the findings necessary for a nonparent to establish standing, pursuant to section 11-5(b) of that statute. The circuit court then held a hearing on that petition, and after hearing testimony from the caseworker, Shelisa, and Benjamin, the court ruled orally that it was "bound by the Juvenile Court Act," it must "act in this child's best interest," and because she had been living with Shelisa for almost her entire life, "[t]he motion for private guardian is granted." In its written order, the court granted the petition for private guardianship pursuant to the Probate Act, with preprinted language, stating that "[t]he minor is living in a stable home" and "[i]t is in the best interest of the minor to have no further monitoring by the court."

¶ 40    In accordance with the statutory scheme set out in the Probate Act above, before granting the petition for guardianship, the court was first required to determine whether the presumption that Benjamin was willing and able to make the day-to-day care decisions for his daughter had been rebutted and then whether guardianship was in M.S.'s best interest. See *H.B.*, 2012 IL App (3d) 120475, ¶ 36. The record clearly shows that the issue of whether Benjamin was a willing and able parent was not actually tried, as required under the Probate Act. Rather, the circuit court appeared to treat the hearing as a dispositional hearing under the Juvenile Court Act on best interests of the child. As such, we conclude that the circuit court failed to comply with the Probate Act and the court was without jurisdiction to procced to the merits of the guardianship of M.S. See

*In re A.M.*, 2013 IL App (3d) 120809, ¶ 34 (reversing where the trial court failed to conduct a separate hearing on whether the respondent was "willing and able" under the Probate Act and therefore "the court was without jurisdiction to proceed" on the merits of the guardianship case).

¶ 41    Nonetheless, the public guardian argues that the State gave proper notice and service through publication, the circuit court entered an order defaulting the unknown fathers, and circuit courts "routinely terminate the parental rights of unknown fathers." We note that Benjamin does not claim that service on him as an unknown father was defective. However, on July 28, 2023, the circuit court adjudicated Benjamin as the natural father of M.S., as a result of DNA testing. This order is directly contrary to the default order entered earlier in the case, and as such, it supersedes that order. The court cannot declare Benjamin the father and then proceed as though the father is unknown, despite also allowing him to remain involved in his child's proceedings. The parent-child relationship had been established, and the court should have proceeded in the manner required under section 11-5(b) of the Probate Act, as Benjamin was known and *his parental rights* had not terminated. See 750 ILCS 46/201(b)(3) (West 2022) (under the Illinois Parentage Act of 2015, "[t]he parent-child relationship is established between a man and a child by *** an adjudication of the man's parentage"). Because the court failed to comply with the dictates of the Probate Act, its August 28, 2024, orders regarding private guardianship are vacated, and this matter is remanded for a hearing compliant with the Probate Act, where each requirement under section 11-5 is separately addressed.

¶ 42    Even were we to find that the circuit court complied with the Probate Act, we nonetheless also conclude that Benjamin's procedural due process rights were violated by the manner in which his petition was denied.

¶ 43    Benjamin argues that the circuit court's premature termination of the proceedings on his petition and denial of the same was unfair, and further, that his right to present evidence on his own petition was violated. In response, the public guardian asserts that there was no procedural due process violation here because the court afforded Benjamin "a full hearing on all his requests, and allowed him to testify, without limitation, on two different occasions regarding his desire to gain custody of [M.S.]" According to the public guardian, "[t]here was no functional or practical difference between the relevant issues at stake in the April and August 2024 hearings[.]"

¶ 44    Generally, procedural due process requires notice, an opportunity to respond, and a meaningful opportunity to be heard. *Gold Realty Group Co. v. Kismet Café, Inc.*, 358 Ill. App. 3d 675, 681 (2005). This fundamental right, however, " 'has little reality or worth unless one is informed that the matter is pending.' " *BAC Home Loans Servicing, LP v. Mitchell*, 2014 IL 116311, ¶ 28 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).

¶ 45    In the instant case, the circuit court held a hearing on Benjamin's petition for integrated assessment, reunification services, and change in permanency goal on April 22, 2024. Before Benjamin's counsel had completed her direct examination of Benjamin, the court stopped the proceeding, stating that it had not expected lengthy testimony. The court then set a date in May for the hearing to continue. On that date, Benjamin's counsel asked for a continuance because she wanted to review the transcripts from the prior hearing date and, despite her repeated and timely requests for the transcripts, she had not yet received them. The court allowed a continuance, and a new date to continue the hearing on Benjamin's petition was set for September 16.

¶ 46    In the interim, while Benjamin's petition to change the permanency goal was *pending*, DCFS filed a petition to appoint Shelisa as M.S.'s guardian and to close the case. We point out that DCFS's petition was clearly adverse to Benjamin's pending petition. Granting DCFS's

petition would moot Benjamin's and foreclose any possibility of a change in the permanency goal. Nonetheless, the court set a hearing date on DCFS's petition for August 28, 2024, more than two weeks prior to the date previously granted by the court for continuance on Benjamin's petition, without objection from either DCFS or the State. Nothing in the record suggests that the transcripts, which counsel previously alleged were necessary for her to represent Benjamin and continue her direct examination, were available and provided prior to August 28, 2024. Thus, the entire reason for the court continuing the hearing on Benjamin's petition was seemingly ignored once the court proceeded on DCFS's petition on August 28, 2024.

¶ 47 Notably, at the beginning of the August 28, 2024, hearing, the court stated "[t]his matter is coming before the Court for a private guardianship." The court made no reference to Benjamin's pending petition until the end of the hearing on DCFS's petition, and even then, the court's reference to Benjamin's petition was cursory at best. Benjamin's counsel objected to the court's decision to rule on Benjamin's petition, despite the fact that the notice for the hearing only related to the guardianship petition.[7] The court made no response to counsel's objection but noted that the September 16, 2024, date for Benjamin's continued hearing was stricken.

¶ 48 Whether intentional or otherwise, the practical effect of proceeding on DCFS's petition in the face of Benjamin's still pending and calendared hearing was to settle the issue of Shelisa's guardianship and, once final, mooting any claims asserted in Benjamin's petition. We find nothing in the record, nor can we perceive any rationale for why DCFS could not have waited the few short

---

[7]Contrary to the public guardian's urging, we find that this issue is not forfeited, as counsel made a timely objection at the end of the hearing. See *In re Estate of Barabasz*, 2023 IL App (1st) 221260-U, ¶ 40 (petitioners did not forfeit their procedural due process claim where the trial court granted the motion to dismiss unexpectedly at a status hearing and the record showed that the trial court would have dismissed the petition even if they had objected).

weeks until Benjamin's hearing on his own petition was completed to proceed with the private guardianship petition.

¶ 49    Regardless, the court failed to provide notice to Benjamin or his counsel that his hearing would actually proceed on August 28, 2024, rather than September 16, 2024, as ordered. See *id.* (the right to procedural due process has no meaning if a party does not have notice that a matter is pending). The court also did not inform Benjamin of its intent to rule on his petition at the beginning of the hearing on the permanent guardianship hearing. Had the court done so, in light of the substance of Benjamin's petition, counsel would have had the opportunity to object and likely would have objected at that time. Additionally, and although speculative, had Benjamin's counsel known of the court's intent to rule at the outset, she may have altered her examinations of the witnesses or made different arguments before the court. Further, before proceeding on DCFS's petition, the court made no inquiry as to whether counsel had received the sought after transcripts she, and apparently the court, believed necessary to continue the hearing on Benjamin's petition. In our view, it was improper for the court to rule upon Benjamin's petition at the August 28, 2024, hearing. More importantly, it was improper for the court to hold a hearing on a petition, effectively closing the case, while Benjamin's petition was pending. Given that hearing date on Benjamin's petition had already been set by the court, it would seem the court could have easily scheduled a hearing on DCFS's petition after September 16, 2024, if indeed, one was still necessary.

¶ 50    As such, we find that the court violated Benjamin's right to procedural due process, and the court's August 28, 2024, orders are vacated on that ground as well. See *People v. Bounds*, 182 Ill. 2d 1, 5 (1998) (finding the trial court violated the defendant's right to procedural due process where it failed to provide notice to the defendant that it would be ruling on the State's motion to dismiss at the next court date and where the defendant had yet to file his amended petition); *People*

*v. Kitchen*, 189 Ill. 2d 424, 435 (1999) (finding procedural due process violated where "defense counsel went to court prepared for one type of proceeding, only to be surprised when the trial court, without prior notice, reached the merits of the petition and denied all post-conviction relief").

¶ 51 We also reject the public guardian's argument that the *laches* doctrine bars Benjamin from challenging the guardianship orders because he failed to exercise due diligence in establishing his parentage or appearing in the proceedings.

¶ 52 "The *laches* doctrine may be invoked to preclude the assertion of parental rights." *In re Adoption of Miller*, 106 Ill. App. 3d 1025, 1030 (1982). To establish the defense of *laches*, a party must show that there was unreasonable delay in bringing the action and that the delay materially prejudiced him. *Id.* at 1033. Under the *laches* doctrine, "a complainant may be barred when, after ascertaining the facts, he fails promptly to seek redress." *Rodriguez v. Koschny*, 57 Ill. App. 3d 355, 361-62 (1978). "Actual knowledge of the specific facts upon which his claim is based is not a requirement." *Id.* at 362.

¶ 53 Here, the record shows that (1) for the first few years of M.S.'s life, Benjamin did not believe he was her father, as Latresha repeatedly told him that he was not; (2) Latresha informed him in 2021, once the other putative fathers had been excluded, that he was M.S.'s father but he had difficulties with Latresha and he did not believe her; (3) in 2022, he procured a DNA test on his own and contacted Shelisa; (4) at some point, he attempted to contact DCFS but was unable to find the correct caseworker because he did not know M.S.'s last name; and (5) in over four years, while the court was attempting to identify M.S.'s father, Shelisa never informed M.S.'s caseworker, DCFS, or the court that Benjamin may, in fact, be M.S.'s father, despite the fact that he came to her house with Latresha on multiple occasions and Shelisa suspected that he was the

father. It is clear from this record that, once Benjamin ascertained that he was the father, he promptly attempted to involve himself in the proceedings. We would also note that it seems unreasonable to impute knowledge to Benjamin that M.S. was a ward of the court and involved in a DCFS case simply because he had suspicions about M.S.'s parentage. We will not permit the doctrine of *laches* to preclude Benjamin's assertion of his parental rights where there is only a speculative allegation that he had knowledge of his parentage *and* of these proceedings prior to 2022. Moreover, the doctrine also requires that the party asserting *laches* was "materially prejudiced" by the delay. We recognize that the delay in Benjamin's involvement in this case certainly resulted in prejudice to M.S., where she had been living with a foster mother for years and had not been able to form a relationship with her father; however, the private guardianship petition had not yet been filed, and the case was still open. The prejudice suffered by DCFS and the State was that the *natural father*'s appearance and disagreement with guardianship opened a "can of worms" for the court and was an obstacle to their prompt closing of the case. Although we express no opinion on the merits of Benjamin's petition, we decline to find that DCFS and the State suffered material prejudice, such that application of *laches* should serve as a further bar to Benjamin's pursuit of his parental rights.

¶ 54    The following cases support our conclusion and illustrate when, unlike in the instant case, *laches is* appropriate. In *Miller*, the natural father sought to vacate a judgment of adoption, alleging that service by publication was defective. *Miller*, 106 Ill. App. 3d at 1029. Almost a year after the adoption judgment was entered, the father, who was represented by counsel, appeared in court and was presented with a copy of the judgment for adoption at that time. *Id.* at 1027. Twenty-one months later, the father filed a petition to vacate the judgment. *Id.* Although the trial court determined that service was defective, the petition was denied because the father failed to exercise

due diligence once he learned of the adoption, and the reviewing court affirmed, on the basis of the *laches* doctrine. *Id.* at 1029-30.

¶ 55    In *In re Jamari R.*, 2017 IL App (1st) 160850, ¶ 50, the father argued on appeal that the adjudication and dispositional orders were void for lack of personal jurisdiction and the guardian *ad litem* asserted that *laches* barred this claim. This court found that *laches* applied because "[t]he father, represented by counsel, participated in the termination proceedings" and "[t]he father had actual knowledge of the adjudication and dispositional orders yet failed to take any steps to challenge them for almost two years." *Id.* ¶ 62.

¶ 56    Like in *Jamari*, the respondent in *In re A.S.*, 2023 IL App (4th) 230223-U, ¶ 2, also asserted on appeal that the trial court lacked personal jurisdiction over him. The State contended that the respondent's challenge was barred by the doctrine of *laches*. *Id.* ¶ 31. The record there showed that, when the child was placed in the temporary custody of DCFS, the respondent had been given notice of that hearing but he did not appear because he did not believe he was the father. *Id.* ¶ 39. Later reports from DCFS showed that the respondent had been contacted repeatedly for services, but the respondent missed multiple appointments for DNA testing and expressed that he wanted no involvement with the child. *Id.* More than two years after the temporary custody hearing, the respondent appeared before the court but did not raise any challenges to the court's jurisdiction despite participating in termination proceedings for another five months. *Id.* ¶ 40. On appeal, this court found that the respondent was "well aware of the underlying neglect proceedings" and "[t]he facts clearly reflect a lack of due diligence and an unreasonable delay by [the] respondent in pursuing the claim he now raises for the first time on appeal." *Id.* ¶ 41. After also finding prejudice to the child, the court held that the respondent's jurisdictional challenge was barred by *laches*. *Id.* ¶¶ 42-44.

¶ 57    What these cases have in common is that the parents had either been in contact with DCFS or had appeared in court and then waited years to assert their rights. In those cases, the parents were more than sufficiently aware of the proceedings and chose not to intervene. That is not the case here. Nothing in this record shows that Benjamin affirmatively knew of the DCFS case and court proceedings involving M.S. for a prolonged period of time before involving himself. Moreover, according to Benjamin, he requested services from DCFS (and did not receive them) and independently completed 10 weeks of parenting classes. Additionally, he expressed confusion on the record on multiple occasions as to the consequences of guardianship. These facts do not reflect a failure to assert his rights, a lack of due diligence, or an unreasonable delay. As such, we decline to apply the *laches* doctrine in this case.

¶ 58    Briefly, we note the public guardian's citation to *In re Kam. B.*, 2024 IL App (1st) 240599, to assert that the circuit court was not obligated to change the goal to return home. We do not disagree with this contention, and the circuit court is free to come to that conclusion upon remand after providing Benjamin with procedural due process by holding a complete evidentiary hearing on his own petition to change the permanency goal.

¶ 59    Finally, Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) permits a reviewing court, in its discretion, to order that a case be assigned to a different judge on remand. See *Eychaner v. Gross*, 202 Ill. 2d 228, 279 (2002) (the "authority" under Rule 366(a)(5) "includes the power to reassign a matter to a new judge on remand"). We believe reassignment here would be prudent. See *People v. McAfee*, 332 Ill. App. 3d 1091, 1097 (2002) (remanding for resentencing before a different judge removes any suggestion of unfairness). Accordingly, in the exercise of our discretion, we remand this matter to the presiding judge of the appropriate division of the circuit court for reassignment.

¶ 60                                    III. CONCLUSION

¶ 61     For the reasons stated, we vacate the circuit court's August 28, 2024, orders, and we remand this matter for a new hearing on Benjamin's "Petition for Order for Integrated Assessment for Father, for Referrals for Services to Father for Reunification, and to Change Permanency Goal of Guardianship to Return Home" and for a hearing in compliance with section 11-5(b) of the Probate Act (755 ILCS 5/11-5(b) (West 2022)) on the petition for private guardianship.

¶ 62     Vacated and remanded with directions.

*In re M.S.*, 2025 IL App (1st) 241925

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-JA-00607; the Hon. Lisa M. Taylor, Judge, presiding. |
| **Attorneys for Appellant:** | Myra A. Foutris, of Foutris Law Office, Ltd., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John Nowak, Gina DiVito, and Marina C. Para, Assistant State's Attorneys, of counsel), for the People.<br><br>Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Christopher J. Williams, of counsel), for other appellee. |